# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. JKB-16-0259** |
| | * | |
| **JORGE GUERRA-CASTILLO, et al.** | * | |
| | * | |
| | * | |

**\*\*\*\*\*\*\***

## UNITED STATES CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

The United States of America, through its attorneys, Robert K. Hur, United States Attorney for the District of Maryland, and Kenneth S. Clark, Matthew DellaBetta, and Catherine K. Dick, Assistant United States Attorneys, respectfully submit this Consolidated Response in Opposition to pre-trial motions filed by the Defendants, specifically, ECF No. 563 (Cruz-Rodriguez); ECF Nos. 592 through 594 (Portillo-Rodriguez); ECF Nos. 597 through 605 (Guerra-Castillo); ECF Nos. 611, 649 (Argueta), and ECF Nos. 639-40 (Nolasco-Soriano).[1]

---

[1]     In a separate consent motion (ECF 663) the Government sought court approval to delay responding to the motions of ECF Nos. 565-67, 569-70, 641 (Rosa-Moreno); ECF Nos. 582-590 (Arias-Mejia); and ECF Nos. 606 and 609 (Ventura-Morales) until December 1, 2019 in light of the likelihood of those defendants resolving their cases. Rosa-Moreno has since signed a plea agreement and a plea hearing is being scheduled.

# Table of Contents

I.      INTRODUCTION AND PROCEDURAL BACKGROUND ............................3

II.     STATEMENT OF FACTS.....................................................................................5

III.    UNITED STATES CONSOLIDATED RESPONSE TO DEFENDANTS'
        MOTIONS TO SUPPRESS EVIDENCE ........................................................16

        A.  MOTIONS TO SEVER……………………………………………………17

        B.  MOTIONS TO ADOPT………………………………………………...26

        C.  MOTIONS TO SUPPRESS IDENTIFICATIONS…………………………..27

        D.  CRUZ-RODRIGUEZ MOTION…………………………………………..32

        E.  GUERRA-CASTILLO MOTIONS………………………………….......32

        F.  PORTILLO-RODRIGUEZ MOTIONS……………………………………..64

        G.  GOOD FAITH……………………………………………………………71

        H.  MOTIONS FOR LEAVE TO FILE ADDITIONAL MOTIONS…………...73

IV.     NOTE REGARDING HEARING ....................................................................73

V.      CONCLUSION ................................................................................................74

## I.   INTRODUCTION AND PROCEDURAL BACKGROUND

On June 27, 2018, a federal grand jury for the District of Maryland returned a Third Superseding Indictment charging twenty-four members and associates of the international street gang *Mara Salvatrucha*, commonly known as "MS-13," with conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count One); conspiracy to murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) and (6) (Counts Two, Four, and Five); attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(2), (3), (5) (Count Three); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Six).  ECF 324.  In Fourth and Fifth Superseding Indictments, one defendant already charged was added to Count One, RICO conspiracy, ECF 468, and one new defendant – Sorto-Romero – was charged in the RICO conspiracy.  ECF 628.

As of this filing, Francisco Ramirez-Pena, Miguel Lopez-Abrego, Ervin Arrue-Figueroa, Ronald Mendez-Sosa, Edwin Ruiz-Urrutia, Christian Rodriguez-Hernandez, and Darvin Guerra-Zacarias have pled guilty.  A number of other defendants have agreed to plea guilty and have plea hearings scheduled.  The current status of the remaining defendants in custody are:

| | |
|---|---|
| JORGE RAUL GUERRA CASTILLO, a.k.a. Pelon, | Pending Trial |
| CARLOS ALAS BRIZUELA, a.k.a. Truco, | Rearraignment - 12/2/19 |
| CARLOS HERNANDEZ DIAZ, a.k.a. Positivo, | Rearraignment - 12/5/19 |
| MILTON PORTILLO RODRIGUEZ, a.k.a. Little Gangster, | Pending Trial |
| JUAN CARLOS SANDOVAL RODRIGUEZ, a.k.a. Picaro | Pending Trial |
| JOSE ALBERTO SIBRIAN GARCIA, a.k.a. Chango, | Rearraignment - 12/5/19 |
| DARWIN ARIAS MEJIA, a.k.a. City, | Likely Resolution via Plea |
| DAVID NOLASCO SORIANO, a.k.a. Gordo, | Pending Trial |
| ALBARO ROSA MORENO, a.k.a Slow, | Likely Resolution via Plea |
| SAMUEL DIAZ RAMOS, a.k.a. Pequeno, | Pending Trial |
| LUIS FERNANDO CRUZ RODRIGUEZ, a.k.a. Catra, | Pending Trial |
| AXEL ARGUETA, a.k.a. Dimaria, | Pending Trial |
| CARLOS VENTURA MORALES, a.k.a Pantalla, | Likely Resolution via Plea |

| DANNY HERNANDEZ SOLORZANO, a.k.a. Titre, | Rearraignment - 11/26/19 |
| OSCAR SORTO ROMERO, a.k.a. Lobo, | Pending Capital Case Unit |

The remaining defendants are scheduled to proceed to trial on June 1, 2020. The Court set a motions hearing for the week of December 9, 2019. Several pretrial motions remain outstanding, although as discussed below, several of those motions are now moot. Many of the defendants' pretrial motions overlap or address similar issues. Further, some of the defendants filed motions to adopt the pretrial motions of co-defendants. Thus, where the relevant facts and legal issues overlap, the United States attempts to address those motions together.

A chart of pending motions outstanding by each defendant follows:

| Defendant | Motion | ECF No. |
| --- | --- | --- |
| **Cruz-Rodriguez** | Motion to Suppress Statement | 563 |
| **Portillo-Rodriguez** | Motion to Sever | 591 |
| | Motion to Suppress Tangible and Derivative Evidence | 592 |
| | Motion to Suppress Statements | 593 |
| | Motion to Suppress Identification | 594 |
| | Motion to Adopt Motions of Other Defendants | 595 |
| **Guerra-Castillo** | Motion to Sever | 596 |
| | Motion to Suppress Wiretap Evidence | 597 |
| | Motion to Suppress Identification Evidence | 598 |
| | Motion to Suppress from Warrantless Searches | 599 |
| | Motion to Suppress Evidence from Search Warrants | 600 |
| | Motion to Preserve Right to File Pretrial Motions | 601 |
| | Motion to Adopt Motions of Other Defendants | 602 |
| | Motion to Exclude Evidence Not Charged | 603 |
| | Motion to Preclude Hearsay | 604 |
| | Motion to Exclude Cooperating Witness Testimony | 605 |
| **Argueta** | Motion to Adopt Motion of Other Defendant | 611 |
| | Motion to Adopt Motion of Other Defendant | 649 |
| | Motion for Extension of Time to File (Denied – ECF 655) | 650 |
| **Nolasco-Soriano** | Motion to Adopt Motion of Other Defendants | 639 |
| | Motion to Sever | 640 |

A number of defense motions are moot, as they were filed by defendants that have either entered guilty pleas or are scheduled to do so in advance of the motions hearing. As a result, the

Government does not anticipate responding to them or addressing them at the motions hearing. Those are:

| Defendant | Motion | ECF No. |
|---|---|---|
| Hernandez-Solorzano | Motion to Suppress Photo Identification | 481 |
| | Motion for Extension of Time to File Pretrial Motions | 482 |
| | Motion to Adopt Motions of Other Defendants | 483 |
| | Motion for Disclosure of Informants | 484 |
| | Motion to Suppress Cell Phone Search | 485 |
| | Motion to Suppress Statements | 486 |
| | Motion for Disclosure of Rule 404(b) and 609 | 490 |
| Hernandez-Diaz | Motion for Leave to File Additional Motions | 573 |
| | Motion to Adopt Motions of Other Defendants | 574 |
| | Motion for Disclosure of 404(b) and 609 and Memo | 575 & 576 |
| | Motion for Disclosure of Rule 12 Materials | 577 |
| | Motion for Disclosure of Rule 801(d)(2)(E) Materials | 578 |
| | Motion for Disclosure of *Brady* Materials | 579 |
| | Motion to Compel Review of Wit Backgrounds | 580 |
| | Motion to Sever | 581 |

For the reasons stated below, the defendants' motions are either moot or should be denied in their entirety.

## II.     STATEMENT OF FACTS

The defendants are members and associates of violent subsets of the MS-13 gang known as the Fulton Locos Salvatrucha (the "FLS" clique) and Parque Vista Locos Salvatrucha (the "PVLS" clique). Between 2015 and August 2017, these cliques terrorized several areas in Maryland, including the Frederick County, Montgomery County, Prince George's County, and Anne Arundel County areas. The defendants were responsible for at least six murders, five attempted murders, assaults, robberies, extortion, and street-level drug trafficking. The gang used violence and threats of violence to eliminate would-be rivals, and to intimidate the witnesses to and victims of their crimes.

The anticipated evidence in this case comes from various sources, including evidence obtained from search warrants, cellular phone evidence, social media accounts, cellular and social media account location information, DNA evidence, surveillance footage, and numerous witnesses and victims.

A.      **The History, Structure, and Membership of MS-13**

MS-13 is a violent international street gang initially formed in the Los Angeles area and composed largely of individuals of Central American descent.  MS-13 has spread throughout the United States, particularly in areas with sizeable Central American populations, including parts of North Carolina, Virginia, Maryland, New Jersey, New York, and Massachusetts.  MS-13 is organized into a series of sub-units, or "cliques," that operate in specific geographic locations.[2]  A single leader, sometimes known as the "First Word," often controls each clique and is responsible for directing the clique's activities and presiding over gang meetings, or "misas."  MS-13 members – known as "homies" or "homeboys" – typically gain admission to the gang through an initiation process known as "jumping in," wherein members of a clique beat the individual seeking membership for thirteen seconds.[3]  Many, though not all, cliques answer to and are directed by gang leaders in other parts of the United States or in El Salvador.

MS-13 members are required to follow various rules.  In most cases, gang members who violate the rules are punished with a beating, a practice commonly referred to as "corte," but depending on the rule violation, the punishment may include death.  Cooperation with law enforcement is strictly prohibited under MS-13's rules, and is punishable by death.  When a disloyal and/or disobedient gang member is ordered to be killed, he is said to be "green lighted."

---

[2]      Sometimes, MS-13 cliques within a particular geographical area are grouped together into a regional organization known as a "program."

[3]      In some cliques, individuals are required to commit an act of violence before being jumped-in.

Obtaining a "green light" typically requires the authorization of a clique leader and, in some cases, approval from gang leaders in El Salvador.  MS-13's rules require that members attack and kill rival gang members whenever possible.  MS-13's rivals include, among others, the 18th Street gang and the Latin Kings.  MS-13 members sometimes refer to rival gang members using derogatory names, including "chavalas" (for any rival gang member) and "panoyas" (for 18th Street members).

MS-13 cliques often use several means to fund their activities and the purchase of weapons. This includes a pattern of extorting community members, known as collecting "rent," drug trafficking, and the payment of "dues" by MS-13 members, who are required to make regular tribute payments to their respective cliques.  Although each clique has its own internal traditions, all MS-13 cliques – including the Maryland cliques – adhere to the same basic structure, customs, protocols, and objectives.  According to MS-13 rules, any act committed in furtherance of a clique is, by definition, committed in furtherance of MS-13 as a whole.

### B.   Drug Dealing and Extortion

During the course of the RICO conspiracy, the FLS and PVLS cliques generally raised money through the sales of marijuana and extortion of illegal businesses, such as brothels and drug dealers operating in their territory.  Gang leadership would generally obtain bulk quantities of marijuana from other Maryland-based drug dealers, or source of supply from California.  Those drugs would then be broken up for sale by more junior members of the gang.

The cliques also regularly sought to identify and target illegal businesses in the areas they operated that could be charged "rent" payments.  These businesses were often brothels, beer houses operating out of homes, and area drug dealers.  Where there was overlap in territory, particularly in Langley Park, Maryland, the FLS and PVLS cliques would share "rents" so the cliques would collect on alternating weeks.

Proceeds from the gang's activities were provided to Diaz-Ramos, who was a trusted, older member of the gang.  He kept funds for the gang and transferred those to local gang members when they needed money for gang activities, and sent the money to gang leadership in El Salvador and elsewhere when asked.  Diaz-Ramos also kept handguns for the gang and provided them to gang members when they needed a firearm.

### C.      The April 7, 2015 Murder of Victim 1 (Frederick, Maryland).

In April 2015, law enforcement received a missing person report for Victim 1.  In September 2015, the Frederick Police received a call about a body that had been located at a construction site.  The body, which was subsequently identified through DNA and other means as that of Victim 1, consisted of a torso missing a head and both arms.  In addition, the legs were missing from the knees down.  The medical examiner determined that the victim had suffered a fracture to the skull and several stab wounds to the upper torso area, in addition to damage that may have been caused by the backhoe that found the body.  One of his hands had also been amputated.

Three Frederick-based FLS clique members participated in the murder.  On the evening of April 7, 2015, two of them met Victim 1, who was intoxicated at the time, in Frederick.  They pretended they were not MS-13 members and learned that Victim 1 had been associated with a rival gang before moving to the Frederick area.  They then contacted gang leadership in the US and El Salvador, including Guerra-Castillo and Alas, to get approval to kill Victim 1 based on that information.

They lured Victim 1 into a wooded area in Frederick where the gang would regularly meet, suggesting that the group would go smoke marijuana together.  But, they brought weapons to the meeting.  They initially hit Victim 1 with a large rock to disable him.  They then stabbed him with

knives and a machete and dismembered him.  Although they left him in that location that night, two of the participants returned the next day to bury Victim 1's body.

### D.    May 10, 2015 Kidnapping and Extortion of Victim 2 (Frederick, Maryland)

On May 10, 2015, as FLS sought to increase its income through extortion of area brothel owners, a number of FLS members, including Alas and Nolasco-Soriano, kidnapped Victim 2, who was a Frederick-area brothel owner, using a firearm and knives.  They had been instructed by gang leadership (Guerra-Castillo) to kill Victim 2 because he had failed to make extortion payments.  When they got Victim 2 to a secluded area, however, he swore he would make payments and leadership told them to take money from Victim 2 and have him pay regular rent.

### E.    August 28, 2015 Attempted Murder of Victim 3 and Assault of Victim 4 (Frederick, Maryland)

During the summer of 2015, FLS gang members had identified Victim 3 as a Frederick-area leader of the rival 18th Street gang.  As a result, gang leadership, including Guerra-Castillo, was pushing gang members to find Victim 3 and kill him.  When one Frederick-based FLS member failed to kill him quickly enough, gang leadership ordered him to get a "corte," in which gang members, including Diaz-Ramos, beat the gang member as punishment.

In the days leading up to August 28, 2015, several FLS members were ordered to conduct surveillance of Victim 3 to determine when he was home.  They reported this information back to gang leadership.

On the morning of August 28, 2015, three FLS gang members, including Nolasco-Soriano, went to the home of Victim 3.  Victim 3 was out with Victim 4 running errands so they got into the apartment and waited for them to return.  When Victim 3 and 4 walked into the apartment, the FLS members attacked Victim 3 with knives and a machete, nearly severing both hands and inflicting severe stabbing and slashing wounds to his face and torso.  He was treated on the scene

and transported via helicopter to Maryland Shock Trauma, where they were able to save his life. He still has limited use of one hand and no use of the other. The FLS members also slashed his girlfriend, Victim 4, with a knife in the face and severely damaged her hand when it was slammed in a door. She was transported to a local hospital but then transferred to Shock Trauma when it was realized that she also had a broken jaw that would require treatment.

### F.      August 30, 2015 Murder of Victim 5 (Wheaton, Maryland)

On August 31, 2015, Alas and another FLS member murdered Victim 5 near a Dunkin Donuts in Wheaton, Maryland. Victim 5 had been seen in the area previously wearing Nike Cortez sneakers (which only gang members are allowed to wear) and Alas had previously confronted him about them. Alas, and other FLS members, were outside the Dunkin Donuts and, when they confronted Victim 5, he threw a beer at Alas and ran. Alas and another FLS member chased Victim 5 down and stabbed him to death. The next day they reported the murder to Guerra Castillo, informing him that the victim was an 18th Street member and flashed an 18th Street gang sign while they were stabbing him.

### G.      December 23, 2015 Attempted Murder of Victim 6 (Frederick, Maryland)

In December 2015, FLS members had identified Victim 6 as a rival member of the 18th Street gang located in Frederick, Maryland. Gang leadership wanted Victim 6 killed and an FLS member needed to commit a murder to be elevated to homeboy. Thus, the gang arranged to have him murder Victim 6. He was directed to commit the murder by gang leadership, including Alas. The FLS member and Argueta followed Victim 6 home from work, at which point the FLS member approached him and stabbed him at his door step, fleeing quickly. Victim 6 was wounded but survived. After the attempt, FLS gang members reported it to Guerra Castillo.

### H.      May 2016 Conspiracy to Murder Victim 8

In or about May 2016, FLS gang leadership, including Guerra-Castillo, was eager to have the gang make its presence known in Frederick by committing a murder.  They pressured younger members of the gang to identify rival who could be killed and even gave one member a disciplinary "corte" when he failed to identify a target quickly enough.

But, in early May, an FLS gang member had identified Victim 8 as an 18th Street member and provided his address in Frederick, Maryland to gang leadership.  FLS members, including Hernandez Diaz, then went to Frederick to kill Victim 8, bringing a firearm.  Hernandez-Diaz served as a spotter to identify when Victim 8 was coming home, and the other FLS member hid in the bushes by Victim 8's home.  Hernandez Diaz notified the other FLS member when the victim was coming up the street but, when he arrived, Victim 8 went to a different address on the same block.  As a result, the FLS members were unable to attack Victim 8.

### I.      July 4, 2016 Attempted Murder of Victim 9

In late June/early July 2016, FLS gang leadership identified Victim 9 as a possible associate of 18th Street gang because he had been seen dating a girl who was associated with that gang.  FLS gang leadership told Sibrian-Garcia and Hernandez-Diaz about it and informed Guerra-Castillo of Victim 9, who said that they should try to lure Victim 9 out so that they could kill him.

The night of the shooting, another gang member said that he would bring Victim 9 out.  FLS gang members, including Sibrian-Garcia (who brought a machete), and Hernandez-Diaz, gathered and they went to dig a hole in Wheaton Regional Park.  When the other gang member said that he would not be able to lure Victim 9 out, the FLS gang members went to find the victim, who was walking home.  They found Victim 9 walking and FLS members approached him.  One of the FLS members shot him in the face with a .38 caliber revolver.

**J.**      **December 2016 Attempted Murder of Victims 11 and 12 (Wheaton, Maryland)**

On December 14, 2016, FLS gang members went to Aspen Hill, Maryland looking for 18th Street members. They identified Victims 11 and 12 sitting in a car. They contacted Hernandez-Diaz to pick up a .38 caliber pistol. Once there, Hernandez-Solorzano agreed to shoot the victims so he could move up in rank in MS-13. Hernandez-Solorzano approached the vehicle, knocked on the window, and shot the occupants when it was opened. Both victims survived but suffered serious wounds.

**K.**      **March 31, 2017 Murder of Victim 13 (Wheaton, Maryland)**

MS-13 member Portillo-Rodriguez determined that Victim 13 was giving information about the gang to rival gang members through a woman he was dating. FLS leadership, including Portillo-Rodriguez, then planned the victim's murder. On March 31, 2017, Sibrian-Garcia, Portillo-Rodriguez, Sandoval-Rodriguez and other gang members lured Victim 13 to a park in Wheaton, Maryland telling him that they were going to a party. Prior to their arrival, other gang members, including Rosa-Moreno and Sorto-Romero, had gone to the park to prepare for the murder. There they dug a deep hold in the ground with the intention of throwing the victim's body parts into it. They then waited for the other gang members to arrive with the victim.

When the victim arrived, FLS gang members choked him until he passed out. Each individual present then hit Victim 13 with a machete until he was dead. After his death, FLS members cut his body into multiple parts and placed them in the grave. They also removed his heart.

Law enforcement recovered Victim 13's body from the grave in Wheaton Regional Park in September 2017.

L.     **April 3, 2017 Murder of Victim 14 (Frederick, Maryland)**

A few days after the murder of Victim 13, on April 3, 2017, Hernandez-Diaz received word from other FLS gang members that they had identified a "chavala" (i.e., suspected rival gang member) in Silver Spring, Maryland.  Hernandez-Diaz and other gang leadership went to the area to determine if the individual was in fact a rival gang member.  They found Victim 14, who was very drunk.  Despite that, the victim denied being part of a gang.  They went through his phone and saw he had accessed the Facebook page of someone from a rival gang, Mara Makina.  This evidence was sufficient to determine he was a rival gang member, and had to be killed.

They decided to murder him in Frederick, Maryland.  They then contacted Sorto-Romero, who was the first word of the PVLS clique to get additional assistance and cars.  Sorto-Romero had already learned about the plan from another PVLS member, Rosa-Moreno.  Frederick-based FLS member Mejia Arias, told them that they could do the murder in Frederick and that he knew a spot.  After stealing a machete and shovels from a shed, gang members traveled to Frederick to prepare the site of the murder and meet Sorto-Romero and others who would be transporting Victim 14.

In Frederick, several gang members went to the wooded area set for the murder and dug a grave.  Others returned to Frederick to meet the victim and other gang members.  Other MS-13 members arrived at Mejia Arias's house and were directed to the grave site by an FLS leader.  Cruz-Rodriquez gave them a ride to the location.  Sorto Romero and another PVLS member brought Victim 14 to the house and followed Cruz-Rodriguez's car to the murder site.  Several gang members did not participate in the murder, including Sorto-Romero and Cruz-Rodriguez.

At the murder site, Mejia-Arias and other gang members took the victim in the woods and began to beat him.  When Victim 14 started screaming, Mejia-Arias hit him in the head with a log, which rendered him unconscious.  After that, the gang members dragged the victim to the pre-dug

13

grave and everyone, including Hernandez-Diaz, took part in dismembering him.  They attempted to decapitate him and struck him across the middle to try to cut him in half, which is consistent with the wounds found on the victim.  The pre-dug grave was not large enough for the body and a leg was sticking out, so they hacked off the victim's foot and part of his leg at the shin bone.  After the murder, Hernandez-Diaz called gang leadership to confirm it was done.

Victim 14 was a missing person from Montgomery County.  His body was found on June 29, 2017 when a hiker in a watershed/wooded area near Frederick, Maryland noticed part of a leg bone (tibia and fibia) sticking up out of the ground.  His body was recovered by law enforcement on June 30, 2017.

### M.      June 14, 2017 Assault of Victim 15 and Victim 16 (Wheaton Regional Park)

On June 14, 2017, MS-13 gang members, including Sibrian-Garcia, Sorto-Romero, and Rosa-Moreno, were in Wheaton Regional Park and identified Victims 15 and 16 as potential rival gang members.  They approached the victims in the bathroom and forced them outside at knife point.  They then separated the two victims for a period of time and held them before bringing them back together and forcing them into the woods.

They then proceeded to beat them with a large branch, their fists and feet.  They said that they wanted to kill the victims and talked about killing them with a knife.  When a man walking his dog approached, the suspects ran away.  Both victims were transported to the hospital to deal with scratch and bruise injuries, in additional to possible internal injuries and spinal damage.  Both of their cell phones were stolen.

### N.      June 14, 2017 Assault of Victim 17 (Silver Spring)

Later that same day, Guerra-Zacarias called Sibrian-Garcia or Hernandez Diaz and informed them that there was an 18th Street member (Toro) near the Dunkin Donuts.  FLS gang members, including Hernandez-Diaz, Sibrian-Garcia, and Lopez-Abrego, went to the area to look

for him and split up.  On FLS member found him and pretended to be an 18th Street member in order to make friends.  The FLS member then claimed that he lived nearby at which point Victim 17 said that another 18th Street member lived on the same block and they should walk that way.

As they walked towards that neighborhood, the FLS member informed Sibrian-Garcia where they were.  Then Guerra-Zacarias, Lopez-Abrego, Sibrian-Garcia, Hernandez-Diaz, land other gang members arrived at the area and assaulted Victim 17.

When the police arrived on the scene they found Victim 17 with significant injuries to his face and head.  They brought him back to consciousness and transported him to the hospital to receive treatment for a laceration to his head that was at least 3 inches long, multiple abrasions, swelling, the shoe print on his face and a possible concussion.

### O.       June 24-25, 2017 Murder of Victim 18 (Crownsville, Maryland)

Victim 18 was a woman who Fulton clique members believed was associated with the 18th Street gang.  That was sufficient to determine she was a chavala who needed to be killed.

In the weeks leading up to the murder, Portillo-Rodriguez approached other FLS leadership about a plan to lure Victim 18 out to kill her.  They discussed the plan with Guerra-Castillo, who encouraged them to have his girlfriend, Argueta, assist in the plan.  Argueta befriended Victim 18 on Facebook and set up a date with Victim 18 for the night of June 24.

On the afternoon of the 24th, Sandoval-Rodriguez, Arrue-Figueroa, and Portillo-Rodriguez found a secluded location in Crownsville, Maryland to commit the murder.  They dropped Sandoval-Rodriguez off to dig a grave.  Arrue-Figueroa, and Portillo Rodriguez then met up with other gang members and Argueta.  Some returned to the site of the murder to wait, while others went to kidnap Victim 18.

When Victim 18 arrived for the date, Argueta was in a car with Guerra-Zacarias driving. Victim 18 got into the car and left with them.  They then drove to another location where they

picked up Ruiz-Urrutia and Portillo-Rodriguez, who boxed Victim 18 in the backseat.  They then picked up Ramirez-Pena, who had the machete.  When the others were picked up Victim 18 realized something was wrong and struggled, ultimately passing out in the car.

The car then drove Victim 18 to the gravesite in Crownsville, Maryland, at which time everyone except Argueta and Guerra-Zacarias – who left the area – got out.  Victim 18 regained consciousness and started struggling and screaming.  Ramirez-Pena could not get her under control so another FLS member clamped a hand over her mouth and pinched her nose closed until she lost consciousness.  The gang members then dragged Victim 18 into the woods, to the gravesite.

In the wooded area, they positioned Victim 18's body on the side of the grave and chopped off her head with a machete.  Everyone present then participated in removing limbs.  Arrue-Figueroa and Ruiz-Urrutia had never done this before so the others instructed them on how to hack off a limb with a machete.

After the murder, Sosa picked everyone up and brought them back to his house, where they disposed of the weapons and soiled clothes and met up with Guerra-Zacarias and Argueta.

In September 2017, law enforcement recovered Victim 18's body from a clandestine grave in Crownsville, Maryland.  The body had sustained a number of sharp force traumas and was cut into multiple pieces with the head severed.

### III.   UNITED STATES CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE

The defendants have filed numerous motions to suppress evidence obtained pursuant to search and seizure warrants.  As a preliminary matter, the United States does not seek to introduce certain evidence during its case-in-chief from several search warrants that are the subject of certain portions of the defendants' motions, as discussed below.  Previously, the United States disclosed redacted versions of the search warrants in discovery due to witness safety concerns because the

early disclosure of some of the information in the search warrants would place witnesses, victims, and potentially family members, at risk. Attached hereto as Exhibits 1 to 23 to the instant Response are materials that include redacted versions of the search warrants subject to the defendants' motions to suppress. Additionally, along with the filing of this Response and at the Court's request, the United States will provide un-redacted copies of the search warrants to the Court for *in camera* review. For the reasons stated herein, the Court should deny the defendants' motions.

### A.     Motions to Sever

Defendants Guerra-Castillo (ECF 596), Portillo-Rodriguez (ECF 591), and Nolasco-Soriano (ECF 640) have filed motions to sever their cases. Each defendant alleges that continued joinder would be prejudicial to their right to a fair trial, and, therefore, severance is proper under Federal Rule of Criminal Procedure 14. The defendants do not provide any specific factual reasons, outside of conclusory assertions, as to why severance is warranted. Contrary to the defendants' contentions, all are properly joined for trial and the Court should deny any motion for severance.

Federal Rule of Criminal Procedure 8(b) provides that two or more defendants may be charged in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." FED. CRIM. R. P. 8(b). Further, "[a]ll defendants need not be charged in each count." *Id.* Where joinder of the defendants for trial appears to prejudice the defendant, "the court may . . . sever the defendants' trials, or provide any other relief that justice requires." FED. CRIM. R. P. 14(a). "The grant or denial of a motion for severance…is within the trial court's discretion." *United States v. West*, 877 F.2d 281, 287 (4th Cir. 1989).

When defendants are properly joined under Rule 8(b), as in this case, severance under Rule 14 is justified "only if there is a serious risk that a joint trial would compromise a specific trial

right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  The party moving for severance must establish that "actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal." *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995) (citations and internal quotations omitted) (emphasis added), cert. denied, 515 U.S. 1151 (1995).  Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief, if any, to the district court's sound discretion.  *Zafiro*, 506 U.S. at 538.

Defendants who are indicted together should be tried together. *See United States v. Hall*, 93 F.3d 126, 131 (4th Cir. 1996); *United States v. Brugman*, 655 F.2d 540, 542 (4th Cir. 1981). Indeed, unless a "miscarriage of justice" will result, there is a presumption that co-defendants should and will be tried together.  *Richardson v. Marsh*, 481 U.S. 200, 206 11 (1987); *United States v. Samuels*, 970 F.2d 1312, 1314 (4th Cir. 1992).  This is particularly true for defendants who, as here, participate in the same conspiracy.  *See United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999); *United States v. Tipton*, 90 F.3d 861, 883 (4th Cir. 1996); *United States v. Ford*, 88 F.3d 1350, 1361 (4th Cir. 1996); *United States v. Reavis*, 48 F.3d 763 (4th Cir. 1995); *United States v. Roberts*, 881 F.2d 95, 102 (1989).  Severance creates an unnecessary burden and inefficiency for the court, the government, and the witnesses by requiring the presentation of the same case on multiple occasions.  As a result, courts generally address claims of potential prejudice through limiting instructions rather than severance.  *See Zafiro*, 506 U.S. at 539; *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.  Further, speculative allegations as to possible prejudice are not enough to establish a basis for severance.  *See United States v. Becker*, 585 F.2d 703, 707 (4th Cir. 1978).

Guerra Castillo, Portillo Rodriguez, and Nolasco-Soriano are all charged with the Conspiracy to Participate in a Racketeering Enterprise, as well specific acts of violence carried out in furtherance of the enterprise.  The evidence at trial will establish that all of the defendants were members and associates of MS-13, the enterprise charged in the indictment.  The defendants entered into the conspiracy to engage in, operate, and promote the purposes of MS-13, and carried out multiple acts of racketeering activity as part of the conspiracy.  These acts included murders, attempted murders, extortion, and illegal distribution.  It is not required that the defendants participate in all of the charged acts together.  Rather, the test for joinder is whether the defendants participated "in the same act, or transaction, or in the same series of acts or transactions." *Brugman*, 655 F.2d at 543.

In the context of racketeering cases, the Fifth Circuit has observed that, "the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *United States v. Elliot*, 571 F.2d 880, 903 (5th Cir.1978).  Rule 8(b) permits joinder of defendants who commit different racketeering acts, so long as those acts constitute predicate acts of the enterprise or were undertaken to further, or in association with the enterprise.   Moreover, Rule 8(b) permits joinder of non-RICO counts with RICO counts where the non-RICO counts relate to the enterprise, even if the defendant is not charged in the RICO counts.  Here, the evidence at trial will reveal that all of the defendants participated in the MS-13 enterprise, carrying out racketeering acts to further the gang's activities in Maryland.  Indeed, a case involving a conspiracy is precisely the type of case in which co-conspirators should be tried together, since much of the evidence presented by the United States in its case-in-chief will pertain to all defendants.  Further, all of the charged defendants are part of the same enterprise, MS-13, and the United States will introduce evidence about the enterprise, its purposes, and its method and means, which is relevant to all

defendants.  Therefore, joinder of the defendants in this matter is proper and the defendants should be tried in a single trial.

> 1. <u>The Evidence Against the Defendants Significantly Overlaps and No Defendant Stands Apart in Culpability</u>

"The language of Rule 8(b) assumes certain evidence may be admitted against one defendant not necessarily applicable to another."  *Brugman*, 655 F.2d at 543.  Defendants are not entitled to severance simply because evidence against one or more defendants is stronger than the evidence against another defendant.  *See United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012); *United States v. Zelaya*, 908 F.3d 920, 928-929 (4th Cir. 2018); *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999) ("A defendant is not entitled to severance…because the evidence against one defendant is not as strong as that against the other.")  In this case, the United States will introduce evidence at trial of numerous racketeering acts committed by the defendants to further MS-13.  While the evidence against each defendant will vary, the degree of culpability between the defendants is not markedly different such that one defendant would be significantly more prejudiced than another.  *See Zafiro*, 506 U.S. at 539.  The defendants are all charged with participating in a violent criminal enterprise where a key feature of the gang was the killing of rival gang members.  The evidence against each defendant is significant and will largely involve social media and electronic evidence, coupled with law enforcement and eyewitness testimony. The case-in-chief against each defendant will share the majority of the same evidence regarding evidence of the gang's illegal activities and the defendants' membership in the conspiracy.  The trial is expected to last multiple weeks, regardless of the final number of trial defendants. Severance will require the United States to present the same evidence at multiple trials, imposing significant resource pressure on the Court.

Here, the defendants speculate that the admissibility of differing evidence is likely to prejudice their right to a fair trial.  However, purely speculative assertions "that there would be evidence admitted against co-defendants that would be inadmissible against [the defendant], and the spillover effect of the evidence" is insufficient to warrant severance.  *United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002).  Unsubstantiated claims of spillover evidence, a nebulous concept in the context of an enterprise theory of prosecution, is not a basis for severance. Moreover, it is difficult to contemplate a subject charged with murder or attempted murder complaining about conduct of his co-defendants and co-conspirators when the evidence demonstrates they agreed to participate in that conduct and the offenses are equally egregious.

As stated above, the Court should grant severance under Rule 14 only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.  There is no such risk in this case.  Although the defendants may have played varying roles in the charged offenses, any risk of prejudice from perceived differences in their levels of relative culpability can be resolved by "less drastic measures [than severance], such as limiting instructions." *Zafiro*, 506 U.S. at 539.  Most fundamentally, the Fourth Circuit has repeatedly emphasized the curative power of jury instructions.  See <u>*Najjar*</u>, 300 F.3d 466; *Zafiro*, 560 U.S. at 540-41; *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow their instructions").  There is no reason to believe that proper instruction in the present prosecution will not adequately safeguard the rights of defendants subject to proper joinder.

Guerra Castillo argues that he will be prejudiced because much of the evidence in the case occurred following his incarceration.  Guerra Castillo provides no reason why such evidence would be inadmissible against him.  As the Fourth Circuit has noted, "a conspiracy's activities do

not always end when some of its members go to jail." *United States v. Howard*, 115 F.3d 1151, 1156 (4th Cir. 1997). The law presumes that a co-conspirator's membership in a conspiracy "continue[s] until he withdraws from the conspiracy by affirmative action." *United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989). A defendant's withdrawal from a conspiracy "must be shown by evidence that the defendant acted to defeat or disavow the purposes of the conspiracy," not simply that he was arrested. *Id.* Once a defendant joins a conspiracy, he and the other members are liable for the entire conspiracy and acts done to enable its success, despite his lack of participation in all activities or knowing the full scope of the conspiracy. *See United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993) ("It is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence."). In fact, the evidence at trial will show that Guerra Castillo continued to participate in MS-13's activities while incarcerated as he continued to direct gang members in Maryland and authorize various acts of violence from afar.

The Court can instruct the jury to weigh the evidence as to each defendant separately, which regularly occurs in multi-defendant cases. There is no reason to suspect the jury will not follow the court's instructions. Therefore, even though evidence may be admissible against some defendants and not others, and the defendants have varying degrees of culpability, a limiting instruction is the proper way to address these concerns. The defendants' claim that severance will avoid the necessity of the Court providing the jury with numerous instructions is also without merit, as that is the purpose of limiting instructions. Thus, this Court should deny the defendant's severance motion on these bases.

2.     The Pursuit of Different Trial Strategies Does not Necessitate Severance

"Antagonistic defenses do not per se require severance, even if the defendants are hostile or attempt to cast the blame on each other." *Becker*, 585 F.2d at 707. "Moreover, Rule 14 does

not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538-539.  Here, the defendants make no claim as to the basis for their conflicting defenses and offer no evidence that any of their defenses actually conflict.  Instead, the defendants speculate that the inevitable pursuit of different trial strategies is enough to warrant severance.  As a result, the Court has no basis to grant the defendant's motion.  *See United States v. Spitler*, 800 F.2d 1267, 1272 (4th Cir. 1986) ("Where, as here, the defendant fails to state the nature of his defense and in what respect, if any, his defense is irreconcilable with that of his co-defendant, there is no basis to grant the defendant's motion for severance.)".

Certainly, "joint participants in a scheme often will point the finger at each other to deflect guilt from themselves or will attempt to lessen the importance of their role, [and] a certain amount of conflict among defendants is inherent in most multi-defendant trials." *United States v. Smith*, 44 F.3d 1259, 1266-1267 (4th Cir. 1995).  Even if the defendants in this case asserted some evidence of conflicting defenses, "joined defendants must show that the conflict is of such magnitude that 'the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *Smith*, 44 F.3d at 1267 (quoting Becker, 585 F.2d at 707).  Further, "[t]here must be such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other…or 'that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *Najjar*, 300 F.3d at 474 (quoting *Becker*, 585 F.2d at 707).

Undeniably, there is no showing that any of the defendants' prospective defenses establish "irreconcilable defenses nor that the jury would unjustifiably convict defendants solely from such conflict[s]" that would necessitate severance.  *Spitler*, 800 F.2d at 1273.  Similarly, the defendants

make no assertion as to how "a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.  Thus, this Court should deny severance based on the defendants' unsupported claim of conflicting or antagonistic defenses.

3.   The Mere Claim of the Need for Co-defendant Testimony Does Merit Severance

"A defendant's attempt to have her trial severed from that of a co-defendant is far less likely to succeed when the request is based on the asserted need for a co-defendant's testimony." *Reavis*, 48 F.3d at 763.  To succeed on a motion to sever under such a theory, a defendant must establish four things, none of which are present in this case: (1) a bona fide need for the testimony of his co-defendant; (2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege; (3) the substance of his co-defendant's testimony; and (4) the exculpatory nature and effect of such testimony.  *Id.* at 767 (citing *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983)).  Severance is unwarranted "unless the moving party demonstrates that her co-defendant's testimony would be more than a 'vague and conclusory statement . . . of purely cumulative or negligible weight or probative value.'"  *Id.* (citing *Parodi*, 703 F.2d 780). Lastly, "[t]he movant's showing in this regard must be sufficiently definite so that the trial court can evaluate the 'exculpatory nature and effect' of the co-defendant's potential testimony."  *Id.*

Here, the defendants merely contend, without any supporting facts, that a joint trial is likely to deprive them of the ability to call a co-defendant to testify on their behalf.  These assertions fall well short of the requirements under *Reavis* and *Parodi* to grant severance based on the needed testimony of a co-defendant.

Equally unfounded are the defendants' assertions that a co-defendant's testimony could unduly influence the jurors against him because the jurors may draw a negative inference about a

non-testifying defendant's choice to exercise his right not to testify on his own behalf, or the jury's rejection of the testimony of a co-defendant could negatively impact the defendant. "It is axiomatic that a defendant's failure to testify cannot be used to draw an inference of guilt. Similarly, a co-defendant's failure to testify cannot be used to draw an inference of innocence on behalf of the complaining defendant." *Najjar*, 300 F.3d at 475. As is commonplace in every case, the United States expects the Court to issue an instruction advising the jury that a defendant has a constitutional right not to testify and that the jury must not draw any inferences because a defendant did not testify. Again, "juries are presumed to follow their instructions." *Richardson*, 481 U.S. at 211. It is the role of the jury to assign credibility and weight to the evidence which with they are presented. Any fears of prejudice the defendants may have can be assuaged by the Court's instruction. Therefore, this Court should deny severance based on these unsupported claims.

4.    Severance is Not Warranted Pursuant to *Bruton v. United States*

Severance is required when a non-testifying co-defendant's confession that inculpates a defendant is admitted, regardless of whether the jury is instructed to only consider the confession against the co-defendant who gave the confession. *Bruton v. United States*, 391 U.S. 123, 135-36 (1968). First, the United States does not anticipate introducing any confessions from non-testifying co-defendants that would implicate any other co-defendants. Second, even if the United States intended to introduce such a statement, this Court could address any *Bruton* issues through redaction of the statement. Again, the defendants provide no factual basis for their assertions.

If a confession is "limited to facially incriminating confessions, *Bruton* can be complied with by redaction." *Richardson v. Marsh*, 481 U.S. 200, 209 (1987). "[S]tatements that, when redacted, do not even refer to the existence of the defendant are admissible and do not require severance." *Akinkoye*, 185 F.3d at 198. Further, any "redacted statements that refer to the existence of another party who may be the defendant through symbols or neutral pronouns are

admissible." *Id.* Therefore, even if the United States intended to introduce any out-of-court statements made by a co-defendant to government agents, any inculpatory portions related to another co-defendant can be adequately redacted to "reduce significantly or to eliminate the special prejudice that the Bruton Court found." *Gray v. Maryland*, 523 U.S. 185, 192 (1998). Thus, the Court should deny severance based on any *Bruton* claim. For the foregoing reasons, the United States hereby respectfully requests that the Court deny the defendants' motions to sever their trials.

### B.      Motions to Adopt

Several defendants have filed motions to adopt relevant motions filed by their co-defendants. (Portillo-Rodriguez, ECF 595; Guerra-Castillo, ECF 602; Nolasco-Soriano, ECF 639; Argueta, ECF 611 & 649.) Although the government does not object to the adoption of motions of general applicability, it is respectfully requested that the defendants be required to particularize their basis for adopting co-defendants' motions to the extent they are relying on different facts or authorities. Otherwise, the government is left in the impossible position of having to guess about the issues to which it should respond and what evidence will need to be presented at the motions hearing. *See United States v. Hickok*, 481 F.2d 377, 378–79 (9th Cir. 1973) (a motion to suppress evidence must set forth allegations of relevant factual issues "with definiteness, clarity, and specificity"); *United States v. Randle*, 966, F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a prima facie showing of illegality. Reliance on vague, conclusory allegations is insufficient."); *cf. United States v. Peterson*, 524 F.2d 167, 178 (4th Cir. 1975) (defendants who failed to present specific grounds for suppressing evidence at motions hearing could not raise claims for the first time during trial).

### C.     <u>Motions to Suppress Identifications</u>

Both Guerra-Castillo (ECF 598) and Portillo-Rodriguez (ECF 594) have filed motions to suppress identifications.  Both motions should be denied because the pre-trial identifications of the defendants by witnesses who know them are not unduly suggestive and are reliable.

Guerra-Castillo and Portillo-Rodriguez both claim that any pretrial identifications of them were "so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." ECF No. 598 at ¶3 and ECF No. 594 ¶3 (internal citations omitted).  These filings have all occurred prior to the scheduled to the release of sensitive Jencks Act material, which is scheduled for release by May 18, 2020.  Release of this material will disclose witness identities and reveal the context in which any pretrial identifications occurred. Review of this materials will show that these identifications were made by victims and cooperating witnesses who knew the defendants. Therefore, the government respectfully suggests that the Court reserve decision on the defendants' pre-trial identifications until the release of all Jencks Act material.

In the course of the investigation, victims and cooperating witnesses have met with law enforcement investigators.  During some of these meetings, these individuals viewed photographs of various members and associates of MS-13, as well as photographs of others not associated with the gang.  While the total number of photographs shown to each witness varied, each witness viewed well over fifty photos.  None of these out-of-court identifications were impermissibly suggestive, and as such, those identifications, as well as any in-court identifications made by the witnesses, should be admissible at trial.

The defendants bears the burden of proof in challenging the admissibility of identification testimony.  *United States v. Wade*, 388 U.S. 218 (1967).  A pretrial identification, and a subsequent in-court identification, is suppressed only if "the [pretrial] photographic identification procedure is so impermissibly suggestive as to give rise to the very substantial likelihood of

misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).  The determination of the admissibility of the testimony of the identification of a defendant is a two-step process.  *See Manson v. Brathwaite*, 432 U.S. 98 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972); *United States v. Johnson*, 114 F.3d 435 (4th Cir. 1997); *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996), cert. denied, 522 U.S. 934 (1997).  The court first determines whether the out-of-court identification procedure was impermissibly suggestive.  *Id.*  If the court finds the procedure was suggestive, the court must then decide if the identification is nonetheless reliable.  If the court does find the identification reliable, the in-court identification is admissible.  *See Wilkerson*, 84 F.3d at 695.  The reliability of the identification is based on the totality of the circumstances.  *See Neil v. Biggers*, at 199-200; *Manson v. Brathwaite*, 432 U.S. at 114; *Holdren v. Legursky*, 16 F.3d 57, 61 (4th Cir. 1994).

The Fourth Circuit has repeatedly held that an identification procedure, even one that involves officers displaying a single photograph to a witness, is reliable and therefore, admissible, where the witness is asked to identify someone with whom he is acquainted, rather than a stranger. *See, e.g., United States v. Johnson*, 114 F.3d 435, 441-42 (4th Cir. 1997); *United States v. Morsley*, 64 F.3d 907, 917 (4th Cir. 1995); *United States v. Burgos*, 55 F.3d 933, 942 (4th Cir. 1995); *United States v. Sanchez*, 165 F.3d 22 (4th Cir. 1988); *Ruff v. Wyrick*, 709 F.2d 1219, 1220 (8th Cir. 1983).

Moreover, "an in-court identification may be admissible even if an antecedent out-of-court identification is excluded as tainted, if there exists an independent source for the in-court identification."  *United States v. Wooten*, Crim. No. AMD-03-0182, 2004 WL 1922119 at *5 (D. Md. Aug. 27, 2004) (citing *Wade*, 388 U.S. at 240-42; *United States v. Cranson*, 453 F. 2d 123, 128 (4th Cir. 1971), cert. denied, 409 U.S. 909 (1972); *Wilkerson*, 84 F.3d at 695.  The Fourth Circuit has held that a witness's prior dealings with a defendant can establish this independent

basis for identification.  *See Burgos*, 55 F.3d at 941-42 (witnesses knew the defendant and could base their identification on personal familiarity, wholly independent of their exposure to a suggestive photo array); *United States v. Thomas*, 128 F. App'x. 986, 991-92 (4th Cir. 2005) (unpublished) (in-court identification was properly admitted in spite of a single photograph pretrial identification because the witnesses knew the defendant); *Cranson*, 453 F.2d at 128 (witness knew the defendant by name, was introduced to him in daylight and observed him for five to ten minutes).

        1.      <u>The Identifications Were Not Suggestive Because Witnesses Viewed Photos of the Defendants Amongst a Photobook Containing Numerous Photos</u>

The out-of-court photo identifications of the defendants by witnesses during their separate interviews were not suggestive in any way and the defendants have failed to meet their burden of proof in challenging the admissibility of the identifications.  In this case, after first establishing that the witnesses were familiar with the defendants through prior relationships or interactions, law enforcement investigators showed witnesses numerous photographs.  The photographs did not display biographical or identifying information and the photobook contained only a single photo of each defendant.  District courts that have considered the use of these types of binders or photobooks in factual circumstances similar to this case have generally found this practice not to be impermissibly suggestive.  *See, e.g., United States v. Tervil*, Crim. No. 13–129 (DWF/FLN), 2014 WL 859229, at *3 (D. Minn. Jan. 9, 2014); *United States v. Rodriguez*, No. 12–CR–45S, 2013 WL 6057862, at *3-4 (W.D.N.Y. Nov. 13, 2013); *United States v. Hynson*, Crim. No. 05-576-2, 2007 WL 2692327, at *5 (E.D. Pa. Sept. 11, 2007).  This is because the use of a photobook does not raise the same concerns of suggestiveness presented by the use of a photo line-up or single photograph in the typical witness identification.  Unlike a photo array or other identification procedure where law enforcement seeks to determine if a witness or victim can identity a stranger

who committed an offense, the use of a photobook is "open-ended" and does not raise the same suggestibility concerns. *Rodriguez*, 2013 WL 6057862, at *3-4. This is because the witness views the set of photos and simply identifies anyone he or she recognizes based on prior relationships and personal knowledge. *Id.*

As in *Rodriguez*, nothing about the photobooks themselves or their presentation to the witnesses in this case presented a danger that a witness would misidentify a defendant as a result. The photobooks contained pictures of men and women, as well as individuals of different ages. *See Hynson*, 2007 WL 2692327, at *5 (finding photobooks not suggestive that contained pictures of men and women of various races and ages). The pictures were presented in a variety of sizes, orientations, and photographic quality, so that the defendants' photographs did not stand out from the others to create a substantial risk of the witness misidentifying them as involved in illegal activity. *Id.*

Additionally, when presenting the photobook (or a series of individual photographs that were separately numbered) in witness interviews, government agents told the witnesses that they would be shown some photographs and should indicate whether or not they recognized each person depicted from anywhere, regardless of whether or not they knew the person's name. If a witness identified a photograph, investigators asked follow-up questions regarding how the witness knew the individual. Witnesses were not asked to use the photobook to identify a particular person who had engaged in a particular act; instead, witnesses were asked to identify for investigators any number of persons they recognized, for whatever reason. Further, any single photographs shown to the witnesses were only shown after law enforcement officers established that the witnesses knew the people they were discussing based on prior interactions. Accordingly, the motions to suppress the out-of-court identifications of the defendants should be denied because the defendants

have failed to meet their burden of proving that the identification procedure used here was so impermissibly suggestive as to give rise to the very substantial likelihood of misidentification.

> 2.   Even if the Pre-trial Identifications Were Suggestive, The Identifications Were Reliable Because of Witnesses' Prior Familiarity with the Defendants

Even if the Court finds that the pre-trial identifications were suggestive, they are nonetheless reliable because the witnesses were all friends, associates, fellow gang members, or other people who knew the defendants well before the pre-trial identifications occurred.  The pre-trial identification procedures served as confirmatory identifications to law enforcement that the witnesses knew the particular defendants.  The Court should therefore permit these witnesses to provide in-court identifications of the defendants, as these identifications will be based on the witnesses' independent knowledge of the defendants, not any previous photographs shown to the witnesses.  The evidence will show that the witnesses could identify the defendants just as easily had they not seen the photobooks or any prior photographs of the defendants because of their familiarity with the defendants.  *See, e.g., Johnson*, 114 F.3d at 441-42; *United States v. Pickett*, 174 Fed. Appx. 731 (4th Cir. 2006); *Morsley*, 64 F.3d at 917; *Burgos*, 55 F.3d at 942; *Sanchez*, 165 F.3d at 22; *see also United States v. Washington*, 12 F.3d 1128, 1134 (D.C. Cir 1994); *United States v. Sanchez*, 988 F.2d 1384, 1389–91 (5th Cir 1993); *Ruff v. Wyrick*, 709 F.2d at 1220.

In *Johnson*, the Fourth Circuit held that a witness's in-court identification was sufficiently reliable even where he had been shown a single photograph of the defendant in a suggestive identification procedure.  In finding the witness' identification reliable, the court recognized that the witness had had ample time to observe the defendant and paid close attention to him during a robbery, provided a description of the defendant on the day of his arrest that largely matched the defendant's description, and expressed no hesitance in making the identification.  114 F.3d at 441-42.  Similar circumstances of reliability exist here.  The witnesses generally knew the defendants

for a significant period of time before the identifications procedures, had ample time to become familiar with the defendants' physical appearances, and expressed no hesitance in their identifications of the defendants.  The totality of these circumstances therefore establishes that any in-court identification of the defendants would not be impermissibly suggestive, or tainted by prior photographic displays.  Accordingly, based on the witnesses' prior personal relationships with the defendants, including their joint participation in MS-13 and the charged racketeering and murder conspiracies, any identification at trial is admissible.  *See Burgos*, 55 F.3d at 941-42; *Thomas*, 128 F. App'x. at 991-92 ("if a witness knows the defendant personally, the chance of misidentification from a. . . suggestive photo display is virtually non-existent") (internal quotations and citations omitted).

### D.      Cruz-Rodriguez Motion

Defendant Cruz-Rodriguez has filed a motion to suppress his statements.  ECF 563.  The Government does not anticipate admitting that statement against Cruz-Rodriguez in its case-in-chief and, as a result, his motion should be denied as moot.

### E.      Guerra-Castillo Motions

Defendant Guerra-Castillo has filed a number of additional motions, each of which is addressed below.

#### 1.      Motion to Suppress Evidence from Wiretap (ECF 597)

Defendant Guerra-Castillo moves to suppress evidence obtained as a result of a wiretap in the investigation of the leader of MS-13's "Maryland Program," a collective of cliques to which the Fulton Clique belonged.  *See* ECF 597.  Guerra-Castillo argues that (1) the initial wiretap affidavit failed to provide sufficient facts to establish probable cause, *see id.* ¶¶ 6-10; (2) failed to demonstrate that less intrusive investigative alternatives had failed or were unlikely to succeed,

commonly known as necessity, *see id.* ¶¶ 11-15; and (3) that the government failed to properly minimize interception of electronic communications. *See id.* ¶ 16.

For the reasons set forth below, Guerra-Castillo's arguments lack merit, and the motion should be denied.

a)   <u>Factual and Procedural Background of Wiretap</u>

The Drug Enforcement Administration ("DEA"), Homeland Security Investigations ("HSI") and state law enforcement partners conducted a long-term criminal investigation into a violent gang racketeering and drug trafficking conspiracy involving Jose Augustin Salmeron-Larios ("Salmeron-Larios"). Salmeron-Larios was the leader of the MS-13 "Maryland Program," organizing multiple MS-13 cliques in Maryland, including the Parkview clique (to which Salmeron-Larios belongs) and the Fulton clique (to which Guerra-Castillo belongs). The cliques in the Program worked as a collective to further a variety of criminal activity, including murder, conspiracies to commit murder, drug trafficking, extortion, and witness tampering, culminating in an indictment in the Southern Division of the District of Maryland. *See United States v. Salmeron-Larios*, 16-PX-0444 (D. Md.). In the course of the investigation of the Maryland Program, investigators used a host of investigative methods, including but not limited to confidential informants, grand jury subpoenas, pen traps, telephone toll analysis, physical surveillance, traffic stops, search warrants, and a Title III wiretap, including the wiretap of Salmeron-Larios's phone.

On March 21, 2016, Judge Paul W. Grimm authorized the interception of wire and electronic communications occurring over the cellular telephone assigned telephone number (301) 541-6591, International Mobile Subscriber Identity (IMSI) 310260638009729, with International Mobile Subscriber Identity ("IMSI") 301410925739541, and with service provided by T-Mobile (hereinafter "WIRE TARGET PHONE 2") for a period of thirty days (the "Wiretap"). *See* Exs. 1-3 (3/21/16 Wiretap Affidavit, Application and Order). WIRE TARGET PHONE 2 is a phone

that was associated with Salmeron-Larios.  Judge Grimm authorized continued interceptions of WIRE TARGET PHONE 2 on April 16, 2016.  Judge Motz authorized continued interceptions of WIRE TARGET PHONE 2 on May 19, 2016.  Judge Grimm authorized continued interceptions of WIRE TARGET PHONE 2 on June 17, 2016, and July 15, 2016.

Guerra-Castillo was intercepted on the WIRE TARGET PHONE 2 wiretap, communicating in his capacity as the leader of the Fulton clique with Salmeron-Larios, the leader of the Parkview clique and Maryland Program.

b)    The Wiretap Orders Were Supported By Ample Probable Cause

There was ample evidence to support Judge Grimm's (and Judge Motz's later) probable cause findings that particular communications concerning the enumerated offenses would be obtained through the interception of Salmeron-Larios's WIRE TARGET PHONE 2.

Title 18, United States Code, Section 2518(3)(b) permits a district court to enter an order authorizing a wiretap if "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception."  In applying for such an order, it is not necessary for the applicant to prove beyond a reasonable doubt that communications concerning the offense will be obtained, but only that there is a fair probability thereof.  *See United States v. Alfano*, 838 F.2d 158, 162 (6th Cir.1988).  The issuing judge is in the best position to determine if probable cause has been established in light of the circumstances as they appear at the time.  *See United States v. DePew*, 932 F.2d 324, 327 (4th Cir.1991).  "Great deference is normally paid to such a determination by the issuing judge, and our role is to determine whether the issuing court had a substantial basis for concluding that electronic surveillance would uncover evidence of wrong doing."  *DePew*, 932 F.2d at 327 (citing *Gates*, 462 U.S. at 236).  "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Gates*, 462 U.S. at 232.  The probable

cause determination is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. *See also Grossman*, 400 F.3d at 217.

A review of each of the supporting affidavits demonstrates there was ample probable cause for issuance by Judge Grimm. The motion argues in a conclusory fashion that the initial affidavit "failed to provide sufficient facts to establish probable cause, failed to specify which cell records were used or the source of those records, failed to explain the reliability of informants, and failed to meet the specificity requirements of Title III." ECF 597 ¶ 9.

In fact, the affidavit in support of the initial March 21, 2016 wiretap order contains the following, detailed information, all of which established probable cause:

- a summary of the criminal history and role of the target subjects, *see* Ex. 1 at 22-23 (3/21/16 Affidavit ¶¶ 28-30)

- a description of the confidential sources used during the investigation, in particular CS-3, and the information CS-3 provided regarding Salmeron-Larios and his gang and drug-trafficking activities, *see id.* at 27-28 (3/21/16 Affidavit ¶ 38c); 46-49 (3/21/16 Affidavit ¶¶ 89-95);

- information provided by individuals who participated in a conspiracy to murder a rival gang member of Salmeron-Larios's involvement, *see id.* at 41-43 (3/21/16 Affidavit ¶¶ 75-81);

- intercepted communications of Salmeron-Larios over a California wiretap discussing various matters, including drug trafficking and sending funds to El Salvador to support the gang, *see id.* at 52-57 (3/21/16 Affidavit ¶¶ 99-103);

- analysis of telephone toll/pen records for the target phones, *see id.* at 57 (3/21/16 Affidavit ¶ 105); 61-65 (Affidavit ¶¶ 117-124);

- a traffic stop of Salmeron-Larios on February 20, 2016 in which he appeared agitated and after which he began using a new phone number, *see id.* at 45-46 (3/21/16 Affidavit ¶ 88);

- background concerning MS-13 gang related violence in the Maryland area, *see id.* at 37- 41 (3/21/16 Affidavit ¶¶ 65-74); 43-44 (3/21/16 Affidavit ¶¶ 82-86); and

- background related to MS-13 generally. *See id.* at 12-18 (3/21/16 Affidavit ¶¶ 19-21).

Contrary to the motion's allegation, the affidavit contains highly specific, corroborated, detailed information about the criminal activities of Salmeron-Larios and his co-conspirators. For example, in the description of CS-3, the affidavit describes CS-3's credibility and corroboration in great detail, including corroboration from phone records, surveillance, and information received from other records. *See* Ex. 1 (3/21/16 Affidavit ¶ 38c).  The affidavit goes so far as to disclose polygraphs administered to CS-3 when law enforcement suspected possible deception, and CS-3's consent to monitored phone calls.  *See id.* ¶ 38c n.4.  The argument that the motion fails to explain the reliability of informants is baseless.

 Equally baseless is the argument that the affidavit is defective because it "failed to specify which cell records were used or the source of those records."  ECF 597 ¶ 9.  As set forth in the affidavit, the DEA obtained airtime/billing records and pen registers for TARGET PHONE 2, as well as previous telephones used by Salmeron-Larios (aka "Yankee") and his co-conspirators. *See* Ex. 1 (3/21/16 Affidavit ¶ 105).  The affidavit goes into highly specific detail about the analysis of Salmeron-Larios's phone records, for TARGET PHONE 2 (301-541-6591).  *See id.* (3/21/16 Affidavit ¶¶ 117-124).

Given the ample probable cause provided in the March 21, 2016 wiretap affidavit supporting the wiretap order, the motion – on this basis – should be denied.

c)       *Leon* Good Faith

Assuming, arguendo, that Defendant can demonstrate that the issuing court had no substantial basis to conclude that probable cause existed or that the March 21, 2016 affidavit ad procedural deficiencies, the good faith exception applies and suppression is unwarranted.

Under the good faith rule, evidence is still admissible even if it was "seized pursuant to a warrant subsequently determined to be invalid," provided that the reliance of the law enforcement officers who were executing the warrant was "objectively reasonable." *Miller*, 50 F.Supp.3d at 731. The good faith rule applies in the Fourth Circuit to warrants issued under Title III, like this one. *See id.* at 729 (finding that "even assuming, arguendo, that there is any merit to any of defendant's arguments, I would be compelled to find that the law enforcement officers were entitled to rely on facially valid wiretap orders. In doing so, they acted in good faith, within the meaning of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and its progeny.").

A court should exclude evidence seized pursuant to a warrant subsequently determined to be invalid "only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon*, 468 U.S. at 918. Se*e also United States v. Brewer*, 204 F. App'x 205, 208 (4th Cir. 2006) ("Affiants were entitled to rely on the facially valid wiretap orders pursuant to the good faith exception"). The purpose of the exclusionary rule is to "deter unlawful police conduct," and accordingly a court should suppress evidence "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Leon*, 468 U.S. at 919-20 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)) (internal citations omitted) (emphasis added).

However, searches conducted pursuant to a warrant, like here, are presumed to be in good faith, and thus suppression is presumptively not an appropriate remedy. *See Leon*, 468 U.S. at 922 ("a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search"); *Miller*, 50 F.Supp.3d at 732 (same); *see*

*Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984) ("we refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested"); *see United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) ("searches conducted pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search") (internal quotations omitted).

Courts within the Fourth Circuit have consistently applied these principles to Title III wiretap warrants.  In *United States v. Webb*, the court concluded that, "[b]ecause the affidavit relied upon by the magistrate was not without foundation or unsupported by reasonable evidence, the court need not engage in a deep inquiry of the warrant."  *See* No. 5:15-CR-172-BO-1, 2017 WL 1286810, at *7 (E.D.N.C. Apr. 4, 2017).  In *United States v. Myles*, the Court applied the good faith exception, refusing to exclude the evidence where the defendant "fail[ed] to offer any evidence to suggest that Officer Owens did not rely upon the wiretap applications in good faith." No. 5:15-CR-172-F-2, 2016 WL 1688745, at *11 (E.D.N.C. Apr. 26, 2016).  Likewise, in *United States v. Woodside*, the Court applied the good faith exception when neither party offered any "evidence to suggest that law enforcement did not rely in good faith on the Intercept Orders."  No. 2:16-CR-00163-03, 2017 WL 338005, at *4 (S.D.W.Va. Jan. 23, 2017).

Under *Leon*, the four situations where exclusion is an appropriate remedy are as follows: 1) the magistrate or judge who issued the warrant was misled by information in an affidavit that the affiant knew was false or would have known but for his reckless disregard for the truth; 2) the issuing magistrate wholly abandoned his judicial role; 3) the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable; 4) the warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. *Miller*, 50 F. Supp. 3d at 732 (citing *Leon*, 468 U.S. at 923) (internal quotations omitted).

Here, despite bearing the burden, Defendant presents no evidence and advances no argument contending that the good faith exception should not apply. *See generally* ECF 597.  Like the court in *Myles*, this Court should also apply the good faith exception because Defendant has failed to present any evidence to suggest that reliance on the warrant was not in good faith. *See* 2016 WL 1688745, at *11 (explaining that not only did the defendant fail to offer evidence that officer did not rely upon wiretap application in good faith, but also found that "[n]o credible evidence exists that Judge Dever was knowingly misled or wholly abandoned his judicial role…. Nor were the affidavits so facially deficient or so lacking in probable cause that reliance upon the wiretap orders was unreasonable.").  Because the wiretaps at issue here were approved in court-authorized orders, and agents relied on the facial validity of those orders, the evidence should not be suppressed.

      d)      <u>The Affidavit Properly Established The Need For The Wiretap And That Other Investigative Procedures Had Been Exhausted</u>

The federal wiretap statute expressly provides that, prior to authorizing a wiretap, the issuing judge must find, in addition to probable cause, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).  The purpose of this provision is to ensure that the device of wiretapping is "not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995) (citations omitted).

In construing this statutory requirement, which is often referred to as the "exhaustion" or "necessity" requirement, the Fourth Circuit repeatedly has held that the burden of the Government to show the inadequacy of normal investigative techniques "is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion' . . . that does not 'hamper unduly the investigative powers of law enforcement agents.'"  *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994) (citations omitted); *Oriakhi*, 57 F.3d at 1298; *United States v. Clerkley*, 556 F.2d 709, 714 (4th Cir. 1977); *DePew*, 932 F.2d at 327.   Indeed, the Fourth Circuit has expressly recognized that reading the "necessity" requirement in an "overly restrictive manner" would unduly harm the ability of law enforcement agents to use this "necessary tool of law enforcement." *United States v. Leavis*, 853 F.2d 215, 221 (4th Cir. 1988).   Among other things, the Fourth Circuit has found that although the Government may not use mere conclusory statements about the use of other investigative techniques to justify a wiretap, the Government is not required to show that other methods have been "wholly unsuccessful" or that it has exhausted "all possible alternatives to wiretapping." *Smith*, 31 F.3d at 1297 (citations omitted) (emphasis in original). *Accord Clerkley*, 556 F.2d at 715 (it is quite clear that the "police need not exhaust every conceivable technique before making application for a wiretap").   In *United States v. Wilson*, 484 F.3d 267, 281 (4th Cir. 2007), the Fourth Circuit summarized the necessity requirement as follows:

> Congress has placed a burden on the Government to show the "necessity" of any wiretap Application via a full and complete statement as to whether "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3).  The burden that this provision imposes on the Government, however, is not great, and the adequacy of such a showing is to be tested in a practical and commonsense fashion that does not hamper unduly the investigative powers of law enforcement agents.  Although wiretaps are disfavored tools of law enforcement, the Government need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence [such that] wiretapping becomes reasonable.

*Id.* (citations and quotations omitted) (brackets in original).  In *Wilson* (a narcotics case), where the affidavit included an explanation of why various techniques—including confidential informants, search warrants, and reverse buys—would not achieve the goals of the investigation, the court rejected the Defendant's argument that the fact that certain conspirators had been identified, controlled buys had been made, and some individuals arrested, established a lack of necessity for the wiretap.  *Id.* at 309-10.

The Fourth Circuit recently applied these precedents in *United States v. Galloway*, 749 F.3d 238, 243 (4th Cir. 2014).  In *Galloway*, the Defendant argued that law enforcement's necessity explanations "amounted to bare conclusory statements and boilerplate recitations that would more or less apply to any drug trafficking investigation."  *Galloway*, 749 F.3d at 242.  The Fourth Circuit rejected that argument, observing that the affidavits "contained fairly extensive discussions of why the affiants believed the wiretaps were necessary."  *Galloway*, 749 F.3d at 243.  The court found no abuse of discretion in the issuing court's necessity finding.  *Id.*

In the instant case, the affidavit supporting the March 16, 2016 Wiretap Order discussed at length the use of other investigative techniques and explained why the interception of communications was necessary. *See* Ex. 1 at 65-85 (Affidavit ¶¶ 125-177). Guerra-Castillo's motion to suppress asserts, in a conclusory fashion, that the Government failed to exhaust less intrusive investigative techniques. *See* ECF 597 ¶¶ 14-15.  However, Guerra-Castillo does not propose how other investigative techniques would reveal the nature, extent, places and methods of the gang and narcotics trafficking activities; the identity of the conspirators; or their names, residence, business addresses, and telephone numbers.

Furthermore, Guerra-Castillo ignores the 21 pages of the wiretap affidavit that set forth in exhaustive detail the specific investigative techniques that were considered, attempted, or used, to

include controlled purchases, confidential sources, undercover officers, consensual monitoring, pole cameras, telephone toll/pen records, grand jury/witness interviews, search warrants, GPS tracking order and cell site orders, trash covers, DMV and utility checks, and prior intercepts. *See* Ex. 1 at 65-85 (Affidavit ¶¶ 125-177). The affidavit explains how these techniques were specifically employed in this case, whether they were successful, and whether further exploitation of these techniques would likely accomplish the goals of the investigation. *Id.* For example, the confidential sources were not in a position to identify Salmeron-Larios's source of drug supply, identify his stash location and proceeds from illegal activity and weapons, or to determine the source of his firearms. *See id.* ¶ 135. As set forth in the affidavit, numerous other investigative techniques were attempted, and failed. Ex. 1 at 65-85 (3/12/16 Affidavit ¶¶ 125-177). Thus, the necessity of the wiretap was amply demonstrated. *Id.*

In sum, the affidavit set forth sufficient information to support Judge Grimm's finding that other investigative techniques were inadequate to achieve the goals of the investigation and that, therefore, the wiretap was necessary.

> e) <u>The Wiretap Orders Were Executed in Compliance With the Minimization Requirements</u>

The Defendant makes a bare-bones argument that the Government failed to meet the minimization requirements, but does not identify any calls that he contends were insufficiently minimize or specify how the Government's efforts were not reasonable. *See* ECF 597 ¶ 16.

The federal wiretap statute requires that electronic surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). However, it is well-settled that the wiretapping statute does not require that all innocent communications be left untouched. *See Oriakhi*, 57 F.3d at 1300. Rather, the statute

requires simply that unnecessary intrusions into speakers' privacy be minimized or "reduced to the smallest degree possible." *Id.* (citing *Clerkley*, 556 F.2d at 716).

In determining whether the minimization requirements of § 2518(5) have been met, courts apply a standard of reasonableness on a case-by-case basis. *Id.* Simply put, courts have recognized that the minimization requirement is satisfied if "on the whole, the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion." *Id.* (citations omitted).

In making this inquiry, courts have paid special attention to whether the investigation involved persons who were unidentified, thereby rendering it reasonable for agents to listen longer to certain conversations to determine whether the conversants were actually involved in the crime being investigated. *See Clerkley*, 556 F.2d at 717. Additionally, in making this inquiry, courts have looked favorably on cases in which the authorizing judge has required interim reports in which the Government has advised the court about the amount of minimization being conducted by the monitoring agents. *Id.* Courts also have considered the number of targeted individuals, the ambiguity of the intercepted conversations, the complexity of the acts under investigation, and the general extent of the issuing judge's involvement in the electronic surveillance. *United States v. Ozar*, 50 F.3d 1440, 1447 (8th Cir. 1995). For example, when the investigation is focused on what is thought to be a widespread conspiracy—as in this case—more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. *See Scott v. United States*, 436 U.S. 128, 140 (1978).

Here, the Government produced to the defense the wiretap applications, affidavits, and orders which incorporate the statutory minimization requirements. *See, e.g.*, Ex. 1 (3/21/16 Affidavit) at 86-88 (¶¶ 178-182). The Government also produced interim reports for each period

of interception, which set forth the total number of intercepted calls and text messages, and the number of interceptions marked pertinent and the number minimized (in whole or in part).  *See* Ex. 4 (Wiretap 10-Day Reports). More recently, the Government produced the minimization memoranda authored by the supervising attorneys, setting forth instructions that were consistent with minimization requirements, which were provided to the monitors. *See* Ex. 5-6 (Minimization Memoranda). In addition, the Government produced "line sheets," identifying all interceptions marked pertinent and minimized.

The Government properly complied with the minimization requirements.  Indeed, the Defendant has set forth no facts to suggest that the Government did otherwise.  *See* ECF 597 ¶ 16. Among other things, the minimization requirement contained in the federal wiretap statute was referenced in the Government's wiretap applications and affidavits, and expressly incorporated into the Orders signed by Judge Grimm in this case.

To comply with this directive, the Government met with the monitoring agents on two occasions: first on March 18, 2016 (three days prior to the first Wiretap Order) and again on July 14, 2016, to instruct them on the proper procedures.  The Government also prepared and circulated to the monitoring agents a memorandum from the supervising attorneys, setting forth instructions that were consistent with minimization requirements.  *See, e.g.,* Ex. 5 (4/18/16 Wiretap Guidelines Memorandum); 6 (5/19/16 Wiretap Guidelines Memorandum).  Additionally, the supervising attorneys discussed the minimization procedures and rules with the monitors and agents throughout the course of the Maryland Wiretap and were available at any and all times to answer questions from the monitors and agents.  Moreover, in its regular interim reports submitted to Judge Grimm and Judge Motz, the Government included information about the number of calls

intercepted and minimized, and thereby kept Judge Grimm and Judge Motz fully informed about that aspect of the interceptions. *See, e.g.,* Ex. 4 (Wiretap 10-Day Reports).

In sum, there is no evidence that indicates that the Government failed to comply with the minimization requirements set forth in the wiretap statute.

Even if any such evidence existed, suppression would be limited to the improperly minimized calls, not to all calls intercepted pursuant to the wiretap orders. *See, e.g., United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000) (suppression of a single call appropriate where "the totality of the circumstances demonstrates that the state police's minimization efforts were reasonably managed"); *United States v. Hoffman*, 832 F.2d 1299, 1307-08 (1st Cir.1987) (court rejected Defendant's request to suppress all Title III evidence because the Government flagrantly failed to minimize 22 calls between a suspect's wife and her attorney. Rather the court limited suppression to the 22 non-minimized conversations); *United States v. Manoori*, 304 F.3d 635, 648 (7th Cir. 2002) (appropriate remedy for a minimization failure is generally to suppress any conversation inappropriately monitored; wholesale suppression of all intercepted conversations is reserved for the "particularly horrendous case"); *United States v. Mullen*, 451 F.Supp.2d 509, 538 (W.D.N.Y. 2006) (stating that "suppression of all communications intercepted pursuant to any of the challenged Intercept Orders is not the proper remedy absent a 'pervasive disregard of the minimization requirement'") (quoting *United States v. Cirillo*, 499 F.2d 872, 881 n. 7 (2d Cir. 1974)).

Defendant Guerra-Castillo has not identified any improperly intercepted calls, and therefore the motion fails on that basis as well.[4]

---

4       In light of this, and the information above, the Government does not anticipate calling a witness solely to address minimization.

For all of the foregoing reasons, Guerra-Castillo's Motion to Suppress Wiretap Evidence (ECF 597) should be denied.

2. <u>Motion to Suppress Evidence (ECF 599)</u>

Guerra-Castillo also seeks to suppress various categories of phone and other data (ECF 599).

a) <u>Cellphone data – 205-503-6935</u>

Guerra-Castillo also moves to suppress subscriber and phone call detail records that were obtained pursuant to a Homeland Security Investigations administrative subpoena. ECF No. 599 at ¶2A. Guerra Castillo offers no authority or argument for suppression of these records. The Court should deny Guerra-Castillo's motion because investigators obtained these records pursuant to a valid administrative subpoena. A copy of the subpoena is attached as Exhibit 7.

As an initial matter, of course, "[p]hone customers have no constitutionally cognizable privacy interests in basic subscriber information" so obtaining the information (with or without a subpoena) does "not amount to a constitutional violation." *See United States v. Clenney*, 631 F.3d 658, 666 (4th Cir. 2011). Thus, the information obtained here – subscriber information and phone toll records – do not implicate a constitutional right and are not subject to suppression.

Under the Immigration and Nationality Act, Homeland Security Investigations agents are empowered to issue administrative subpoenas to require the production of books, papers, and documents that relate to an individual's right to "enter, reenter, reside in, or pass through the United States or concerning any mater which is material and relevant to the enforcement" of immigration-related offenses. 8 U.S.C. § 1225(d)(4)(A). Here, agents issued an administrative subpoena in connection with its investigation of Guerra-Castillo for immigration-related offenses. *See* Ex. 7. Guerra-Castillo is not a United States citizen and has been convicted of the offense of illegal re-entry by a previously removed alien, in violation of 8 U.S.C. § 1326. This is an immigration-

related offense (i.e. an offense under the Immigration and Nationality Act) and therefore, investigators' issuance of an administrative subpoena for Guerra-Castillo's phone records was lawful and valid.

b) <u>Cellphone data – 970-302-7626 via 2703(d) Order</u>

Guerra Castillo moves to suppress the seizure of historical cell site location records for the cellular telephone assigned (970) 302-7626, a phone used by Guerra Castillo.  ECF No. 599 at ¶2A.  Guerra Castillo claims that law enforcement obtained these records pursuant to an order issued under 18 U.S.C. § 2703(d).  These records, however, were obtained pursuant to a search warrant issued by the Circuit Court of Maryland for Anne Arundel County.  *See* Ex. 8.  The affidavit submitted in support of the warrant states that two sources of information told Anne Arundel County detectives investigating the murder of Jenni Lopez that Guerra Castillo, a leader in MS-13, directed and authorized the murder of Lopez.  Each source stated that Guerra Castillo communicated by telephone with the sources to discuss and plan the murder.  While the affidavit does not explain how investigators identified Guerra Castillo's specific phone number, officers relied in good faith in obtaining the records pursuant to a search warrant.  "[W]hen an officer acting in objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," evidence obtained with that warrant is admissible at trial even if the warrant is later found to be invalid.  *United States v. Leon*, 468 U.S. 897, 920 (1984); *accord United States v. Qazah*, 810 F.3d 879, 886 (4th Cir. 2015).  The "good-faith exception" allows for admission unless "a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances."  *United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir. 2011) (internal quotation marks omitted).  Indeed, "[s]earches pursuant to a warrant . . . rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that

a law enforcement officer has acted in good faith in conducting the search." *United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994) (internal quotations omitted).

Here, officers relied on a facially valid search warrant to seize the historical cell site records of Guerra Castillo.  Nothing on the face of the search warrant affidavit or the warrant itself would cause a reasonable investigator to doubt the validity of the warrant.  Furthermore, at the time investigators obtained the search warrant, binding Fourth Circuit authority held that law enforcement did not even need a search warrant to obtain Guerra Castillo's historical cell site records.  *Graham*, 824 F.3d at 425.  Therefore, the Court should deny Guerra Castillo's motion to suppress the seizure of historical cell site records.

### c) Jail call recordings from Santa Rosa County and D. Ray James

Defendant Guerra-Castillo moves to suppress recordings of jail calls he made at two institutions: D. Ray James Correctional Facility and Santa Rosa County Jail.  *See* ECF 599 ¶ 2(C). The motion is moot with respect to the calls from Santa Rosa County Jail, as the Government does not intend at this time to introduce them at trial in its case-in-chief against Guerra-Castillo.  With respect to the calls at D. Ray James Correctional Institution, Guerra-Castillo had no reasonable expectation of privacy in his recorded telephone calls while incarcerated; thus, probable cause is not necessary to intercept the calls.  Therefore, for the reasons stated below, the Court should deny Guerra-Castillo's motion to suppress.

### (1) Background

Between May 2, 2017 and December 2, 2017, Guerra-Castillo was incarcerated at the D. Ray James Correctional Facility (DRJCF) in Folkston, Georgia.  While in confinement, the defendant made numerous recorded telephone calls, commonly referred to as "jail calls."  At the beginning of each call, a recording notified both parties to the call that the calls are subject to recording and monitoring.  *See, e.g.,* Ex. 9 (Guerra-Castillo Jail Call Recording at 1:19-1:24).

Specifically, after the receiving party accepted a collect call and prior to beginning the call, both parties are notified, "This call is from a correction facility and is subject to monitoring and recording." *See id.* In the recording provided as Exhibit 9, Guerra-Castillo is heard speaking English to the receiving party after making the call.

In addition to the recorded notification, the phones in the unit in which Guerra-Castillo was housed at DRJCF (K Building Pod 4) had written notifications of monitoring in both English and Spanish. *See* Ex. 10 (Photographs of DRJCF Phones and Warnings).

### (2) There is No Reasonable Expectation of Privacy When Making Telephone Calls While in Confinement

The Fourth Amendment protects against unreasonable searches and seizures conducted by a government agency. However, the proscription against unreasonable searches and seizures for prisoners does not apply within the confines of a detention center. *See Hudson v. Palmer*, 468 U.S. 517, 526-28 (1984). "A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 527-528. When balancing society's interest in the safety of penal institutions and a prisoner's privacy within the prison, "it is accepted by our society that 'loss of freedom of choice and privacy are inherent incidents of confinement.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 537 (1979)). In the context of a prisoner's expectation of privacy, courts have long held that "a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." *Lanza v. New York*, 370 U.S. 139, 143 (1962).

In the Fourth Circuit, communications made by an inmate from jail, knowing the facility monitors and records the communications, "[destroys] any reasonable expectation of privacy in their substance." *United States v. Lentz*, 524 F.3d 501, 524 (4th Cir. 2008). In *Lentz*, the Court

found that the defendant waived any reasonable expectation of privacy in telephone calls between the defendant and his attorney, knowing that prison officials recorded and potentially monitored the calls, because the parties were aware of the recording and potential monitoring. *Id.* (citing *United States v. Hatcher*, 323 F.3d 666, 674 (8th Cir. 2003) (holding that persons who are "aware that their conversations were being recorded could not reasonably expect that their conversations would remain private.")).

Here, like *Lentz*, Guerra-Castillo was notified in several different ways that his calls were subject to monitoring and recording. Specifically, each time the defendant made a call, a recording informed both the defendant and the call recipient about the recording and potential monitoring of the call. Further, the phones that he used to make calls had clearly posted warnings in English and Spanish. Clearly, the defendant knew about the recording and potential monitoring of his phone calls by DRJCF and, therefore, he had no reasonable expectation of privacy nor valid privacy interest in his recorded telephone calls. Thus, a seizure did not occur that would trigger the defendant's Fourth Amendment rights in his recorded "jail calls."

Under Title III, it is generally unlawful to intercept "any wire, oral, or electronic communication." 18 U.S.C. § 2511(a). However, in *United States v. Hammond*, the Fourth Circuit held that several exceptions to 18 U.S.C. § 2511 allowed investigators to intercept a defendant's "jail calls." 286 F.3d 189 (4th Cir. 2002). More specifically, the Court ruled that "both the 'law enforcement' and 'consent' exceptions rendered" the recording of "jail calls" permissible. *Id.* at 192. The Court held that the law enforcement exception "excludes from the definition of 'interception' recordings made by 'any telephone or telegraph instrument, equipment or facility, or any component thereof . . . being used by . . . an investigative or law enforcement officer in the ordinary course of his duties.'" *Id.* (quoting 18 U.S.C. § 2510(5)(a)(ii)). Therefore, the law

enforcement exception to 18 U.S.C. § 2511 applies when a prison acts "pursuant to its well-known policies in the ordinary course of its duties in taping the calls," and the interception is lawful.  *Id.*

An incarcerated defendant also consents to having their "jail calls" intercepted.  Under 18 U.S.C. § 2511(2)(c), commonly known as the "consent" exception, it is not unlawful "for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."  In *Hammond*, the Court held that "the 'consent' exception applies to prison inmates … required to permit monitoring as a condition of using prison telephones."  *Id.*  Here, as in *Hammond*, the "consent" exception applies to defendant Guerra-Castillo's "jail calls" because it is standard practice for every inmate phone call to be recorded and potentially monitored, prison officials provided the defendant with ample notice of this practice, and it was a condition of using the prison phones.

For the foregoing reasons, defendant Guerra-Castillo's motion to suppress any evidence seized directly or indirectly from the interception and recording of the defendant's telephonic communications while imprisoned should be denied.

d)     <u>Search and seizure of items from jail cell</u>

Guerra-Castillo moves to suppress the search and seizure of records from his jail cell.  *See* ECF 599 ¶ 1(D).  The Government does not intend to introduce any evidence taken from his jail cell in its case-in-chief against Guerra-Castillo.  Accordingly, the Motion on that basis should be denied as moot.

3.      Evidence from Search Warrants (ECF 600)

      a)      Search of premises and cell phones at 14 Bagget Court, Pensacola, Florida

Guerra-Castillo also claims that the search warrant issued for his home at 14 Baggert Court lacked probable cause and was so deficient that the officers could not have relied in good faith on its legality.  Both claims lack merit.  Attached as Exhibits 11 and 12 are copies of the warrant, and the application and affidavit.

A judicial officer's determination that there is probable cause to issue a search warrant is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).  Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than that required by the preponderance-of-the-evidence standard, *see Gates*, 462 U.S. at 235; *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false.").  Probable cause may be established through information provided by any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip that has been corroborated, *see Gates*, 462 U.S. at 241.  However, information provided by a person who admits their involvement in a crime "carry their own indicia of credibility – sufficient at least to support a finding of probable cause to search." *United States v. Harris*, 403 U.S. 573, 583 (1971).

The Fourth Circuit has held "that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *United States v. Servance*, 394 F.3d 222, 230 (4th Cir.), *vacated*

*on other grounds*, 544 U.S. 1047 (2005).  Thus, warrants are to be upheld "even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought" to the place to be searched.  *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005).

The statement of probable cause need not be written with "[t]echnical elaborate specificity," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and a "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant." *United States v. Bynum*, 293 F.3d 192, 197 (4th Cir. 2002).  "Because probable cause is evaluated through a totality-of-the-circumstances analysis rooted in common sense," a reviewing court should give "great deference" to an issuing judicial officer's decision to issue a warrant based on the facts before him. *Montieth*, 662 F.3d at 664.  The Fourth Amendment governs evidence obtained by state officers through a search and seizure warrant. *United States v. Clyburn*, 24 F.3d 613, 616 (4th Cir. 1994).

Here, the search warrant for 14 Baggett Court, Pensacola, Florida was issued on August 23, 2016 by United States Magistrate Judge Charles J. Kahn, Jr. of the Northern District of Florida. It described the location to be searched on Attachment A and detailed 11 different categories of items to be searched for and seized on Attachment B.  *See* Ex. 11 at Att. A & B.  The application for that warrant was made by DEA Special Agent Joseph Ahearn and accompanied by a thirty-page affidavit providing the basis for probable cause.  Ex. 12, Aff.

Specifically, the affidavit provided the background on the affiant, Ex. 12 Aff. at 1-2, and background on MS-13. *Id.* Aff. at 2-9.  It explained the gang members' use of cellular telephones and coded language. *Id.* Aff. at 7-8.  The affidavit also described in detail a DEA wiretap investigation and provided excerpts from wire calls in which Guerra-Castillo had been intercepted. *Id.* Aff. at 9-24.  In those excerpts, Guerra-Castillo discussed gang business, including a hit on a

"snitch" from the Hollywood clique and bringing gang members down to Florida from Maryland to promote them in the gang.  *Id.* Aff. at 10.  Guerra-Castillo sought to arrange a ride for gang members to retaliate against rivals who had pulled a gun on an MS-13 recruit and discussed the difficulties arising from the arrests (in this case) of other MS-13 gang members.  *Id.* Aff. at 11-12. Guerra-Castillo also discussed retaliating against rival gang members, the firearms that the gang members in Maryland had ready for the task, and their transportation issues.  *Id.* Aff. at 16-17.  In another call, Guerra-Castillo discussed what gang members are allowed to sell marijuana in a particular area.  *Id.* Aff. at 20-21.  He also spoke about where to obtain drug supplies, including sources for both marijuana and crystal meth in Mexico, California, and Atlanta.  *Id.* Aff. at 21-24.

The affidavit established that Guerra-Castillo was the user of the phones and explained how he was identified as a resident at 14 Baggett Court.  It explained the location information linking the phone number being used by Guerra-Castillo on the intercepted calls to 14 Baggett Court.  *Id.* Aff. at 15.  It also detailed the location data used to identify Guerra-Castillo as the user of a subsequent cell phone and related surveillance of the car being used by Guerra-Castillo at 14 Baggett Court.  *Id.* Aff. at 25-26.  The location data also showed that the phone used by Guerra-Castillo was located at 14 Baggett Court overnight every night for 10 days.  *Id.* Aff. at 27.

The affidavit detailed the affiant's knowledge, training, and experience that those involved in drug trafficking maintain records of finances and proceeds of drug trafficking in their residences. *Id.* Aff. at 27-28.  They often use cellular telephones to communicate and store information about their illegal activities, *id.* Aff. at 28-29, and they keep firearms, contraband, and records of drug trafficking in their residences.  *Id.* Aff. at 29-30.

Thus, the affidavit provided ample probable cause to believe that Guerra-Castillo was an MS-13 member involved in drug trafficking and that evidence of his crimes would likely be found

at his home and on his cellular telephones.  Attachment B to the warrant detailed the records, documents, electronic devices, controlled substances, firearms, and other relevant items to be seized. Ex. 11 Att. B.  It also detailed that "[a]ll electronic evidence to be subject to later forensic review," including the "[c]ellular telephone(s) and/or portable telephones" recovered therein.  *Id.*

As discussed further below, to the extent that the warrant was in any way lacking in probable cause, it was not so deficient that investigators were not acting in good faith in relying on it. *See United States v. Leon*, 468 U.S. 987 (1984).

b)      Search of Facebook records from "Leon Oscar"

Guerra-Castillo moves to suppress the search and seizure of records from Facebook for user 100009790428458 "Leon Oscar."  *See* ECF 600 ¶ 2(c).  The search warrant was valid, and accordingly, the motion should be denied.

*(1)      Probable Cause and Nexus Supporting Search Warrant*

Guerra-Castillo's Facebook account under the Facebook user name "Leon Oscar" was seized and searched pursuant to a search warrant sworn to Magistrate Judge J. Mark Coulson on August 29, 2018.  *See* Ex. 13.  As set forth in the affidavit in support of the search warrant, Guerra-Castillo is a leader of the Fulton clique of MS-13, who has been a member since 2000 and achieved the rank of homeboy by 2003.  *See id.* ¶ 32.  Guerra-Castillo led the Fulton clique both while he was out on the streets and while incarcerated through the use of a prison phone and contraband cellphone.  *See id.*

The Fulton clique engaged in numerous violent acts while under Guerra-Castillo's leadership, including at least five murders and three attempted murders between April 2015 and June 2017.  *See id.* ¶ 34.  The investigation of the clique showed that Guerra-Castillo encouraged violence and intimidation, and for lower ranking members to commit murders to move up to the rank of homeboy.  *See id.* ¶ 35.

The DEA recovered Guerra-Castillo's phone from his residence in Pensacola, Florida on September 1, 2016. *See id.* ¶ 54. After DEA executed a federal search warrant of the phone, its contents showed that Guerra-Castillo was using the "Leon Oscar" account on Facebook. *See id.* Those searches and seizures were supported by probable cause for the reasons set forth above. *See supra* section III.D.3.a.

The search of Guerra-Castillo's showed that Guerra-Castillo was using the account to communicate with the Facebook account of another known Fulton clique member. *See id.* ¶ 55. The communications between Guerra-Castillo and the second Fulton member were confirmed by a confidential informant. *See id.* Guerra-Castillo's "Leon Oscar" account was also "friends" with the account of another known MS-13 member residing in Virginia. *See id.* ¶ 56.

4.   Motion to Exclude Evidence "Intrinsic" to the Charged Criminal Acts but not Charged in the Indictment (ECF 603)

The defendant argues, essentially, that any evidence not specifically listed as Overt Acts in Count One (racketeering conspiracy) of the indictment should be excluded as improper Rule 404(b) evidence. ECF 603.

"'It is well established that when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment.'" *United States v. Palacios*, 677 F.3d 234, 245 (4th Cir. 2012) (quoting *United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004) (compiling cases from other circuits)); *see also United States v. Pippins*, 761 Fed. Appx. 154, 157 (4th Cir. 2019) (quoting *Palacios*, 677 F.3d at 245).

In *Palacios*, the defendant was charged with RICO conspiracy, murder in aid of racketeering, and conspiracy to commit murder in aid of racketeering, as a part of his participation in MS-13. *Palacios*, 677 F.3d 234 at 238. The Government admitted testimony from cooperators

about a robbery that the defendant had committed with another MS-13 member, an incident in which he had fired a gun in the direction of rival gang members, prior possession of a firearm, and statements that he would "kill all the snitches." *Id.* at 245. The Fourth Circuit found that, to the extent the testimony did not relate directly to the charged murder in aid of racketeering, the testimony "relates to Palacios's participation in MS–13 and can be properly characterized as 'acts committed in furtherance of the conspiracy.'" *Id.* at 245.

Similarly, in *United States v. Zelaya*, the Fourth Circuit held that evidence presented that the defendant had admitted that he was a member of MS-13 was not improper "bad acts" evidence under Rule 404(b). *United States v. Zelaya*, 908 F.3d 920, 928 (4th Cir. 2018). There, the Court found that "Rule 404(b) does not apply to evidence introduced to prove a substantive element of the offense charged." *Id.* The Court explained that "the government had to prove that [the defendant] was a member of MS-13 as an element of its RICO and VICAR charges. It submitted the contested evidence for that narrow purpose, and therefore, the evidence is not subject to a Rule 404(b) analysis." *Id.*

This same logic has applied in a variety of cases. *See United States v. Garcia*, 474 Fed. Appx. 909, 911 (4th Cir. 2012) (holding that evidence of defendants statement and an assault of a rival gang member while in jail was intrinsic to racketeering charges and not subject to Rule 404(b)); *United States v. Williams*, -- Fed. Appx. --, 2019 WL 3226483, *1 (4th Cir. Jul. 17, 2019) (holding that prior conviction was intrinsic to conspiracy to commit sex trafficking charge); *United States v. Pippins*, 761 Fed. Appx. 154, 157 (4th Cir. 2019) (holding that evidence the defendant had threatened to kill someone while holding a gun to their head and demanding money "was intrinsic to the heroin-trafficking conspiracy."); *United States v. Harlan*, 714 Fed. Appx. 220, 223

(4th Cir. 2017) (holding that letter identifying possible fraudulent billing by predecessor company was intrinsic to the charged health care fraud conspiracy).

Despite the mountain of recent Fourth Circuit case law approving the admission of "intrinsic" evidence, Guerra-Castillo relies heavily on a 2000 D.C. Circuit opinion.  In *United States v. Bowie*, the defendant was convicted of possession of counterfeit currency and appealed, "claiming the district court improperly admitted evidence of his possession of counterfeit currency on an earlier occasion."  *United States v. Bowie*, 232 F.3d 923, 925 (D.C. Cir. 2000).  There, the defendant was arrested and charged with the possession of approximately $3,000 in counterfeit U.S. currency.  *Id.* at 925-26.  A month prior to his arrest he had been arrested driving a car in which the police ultimately recovered more than $1,000 in counterfeit U.S. currency – evidence of this prior arrest was admitted at trial.  *Id.* at 926.  The defendant claimed that admission of evidence of this prior arrest was improper 404(b) evidence.  Although the district court found that this evidence was "inextricably intertwined" with charged crime because both sets of seized currency bore the same serial numbers – and thus not subject to 404(b) – the D.C. Circuit disagreed. *Id.* at 930.  It affirmed the admission of the evidence, however, finding that it was admissible under 404(b) as evidence of the defendant's intent and knowledge.  *Id.*

The *Bowie* case dealt with the admission of evidence of possession on one occasion in a prosecution for possession on a subsequent occasion.  This is a classic 404(b) case because such evidence could be improperly treated as propensity evidence absent an alternative basis, such as knowledge or intent.  In the Fourth Circuit cases cited above, however, the evidence that was ultimately admitted was found to be "intrinsic" to the defendants' participation in various types of conspiracies – racketeering, narcotics trafficking, fraud, sex trafficking – because it was a part of and reflected their membership in the enterprise or conspiracy.

58

The Government anticipates that any evidence or testimony presented regarding instances that are not included in the specific overt acts of the conspiracy will be "intrinsic" to establishing the elements of the charges faced by Guerra-Castillo and not 404(b) evidence. *See Zelaya*, 908 F.3d at 928.

Moreover, the defendant does not identify any particular piece of evidence or testimony that is at issue. As a result, determining the merits of the claim proves difficult. It appears that the defendant's primary concern is that some evidence contained in the *Jencks* disclosures might qualify as Rule 404(b) evidence. The Court has established a deadline for the Government to produce *Jencks* material on May 18, 2020, approximately two weeks before trial. Sept. 3, 2019 Am. Sched. Order. As noted above, we do not anticipate presenting evidence that is extrinsic to the charges, but the Government will not object to the timing of any pretrial motion *in limine* re-raising this issue based on something arising from the *Jencks* disclosures.

The defendant's motion should be denied as moot without prejudice to re-raise the issue should it become relevant.

5. <u>Motion to Exclude Hearsay from Alleged Coconspirators (ECF 604)</u>

The defendant also moves to exclude the statements of coconspirators about which cooperating witnesses may testify. ECF 604.

Rule 801(d)(2)(E) provides that a statement is not hearsay if, "[t]he statement is offered against an opposing party … (E) was made by the party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). "In order to admit a statement under 801(d)(2)(E), the moving party must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy." *United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013) (quoting *United States v. Pratt*, 239 F.3d 640, 643 (4th Cir. 2001)). "A statement by a co-

conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." *Id.* (quoting *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994)).  "[A] trial court is not required to hold a hearing to determine whether a conspiracy exists before admitting statements under the rule…." *Graham*, 711 F.3d at 453.

In *Graham*, the Fourth Circuit upheld the district court's admission of wiretap recordings of other coconspirators against the defendant. *Id.* at 455.  There, the court found that calls between coconspirators in a drug conspiracy case in which they discussed collecting a drug debt from Graham in order to pay their supplier were in furtherance of an ongoing conspiracy and properly admitted. *Id.* at 454-55.

More recently, in *United States v. Mathis*, the Fourth Circuit upheld the admission of statements made by co-defendants in a RICO conspiracy prosecution.  *United States v. Mathis*, 932 F.3d 242, 255 (4th Cir. 2019).  There, the challenged statements were made by three different defendants about the murder of a police officer.  *Id.*  The first two statements were made by defendants who participated in the murder to other gang members to either tell them about the murder or seek their assistance in covering it up.  *Id.* at 254.  The court found that both statements had been made in furtherance of the conspiracy because, even though the person to whom the statement was made did not participate in the homicide, the statements provided information to that person on the status of the criminal enterprise (of which he was a member) and/or sought assistance in destroying evidence.  *Id.* at 254-55.  The third statement was made by a defendant to his girlfriend, who was not a member of the enterprise, but whose assistance the defendant sought to dispose of the victim's vehicle.  *Id.* at 255.  The Court noted that, "'even casual relationships to the conspiracy' will satisfy the nexus requirement of Rule 801(d)(2)(E)." *Id.* (quoting *United States v. Smith*, 441 F.3d 254, 262 (4th Cir. 2006)).  In addition, because the defendant sought

assistance with destroying evidence, the statement was also clearly "in furtherance of the conspiracy." *Id.* (citing *United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014)).

Thus, these co-conspirator statements are frequently admitted.   In this case, the Government anticipates admitting the statements of co-conspirators that were made in furtherance of the conspiracy and will be admissible under Rule 801(d)(2)(E).   Applying that Rule, however, is heavily dependent on the circumstances and content.   The defendant does not identify any particular statements that he seeks to exclude.[5]   Unless and until the defendant identifies specific statements that he contends are outside the bounds established by the Rule 801(d)(2)(E), his motion should be denied without prejudice to allow the defendant to re-raise the issue should he identify specific statements as a part of the *Jencks* disclosures.

6.     <u>Motion to Exclude Cooperating Witness Testimony (ECF 605)</u>

The defendant also moves to exclude any testimony by coconspirators, claiming that it is unreliable and will be more prejudicial than probative, under Rule 403.   ECF 605.

"[I]t has long been recognized that grants of immunity, plea agreements, and sentencing leniency are appropriate tools for use in the criminal justice system.   Indeed, the Rules of Criminal Procedure explicitly authorize these devices, and this court has approved them."   *United States v. Levenite*, 277 F.3d 454, 461–62 (4th Cir. 2002) (citing Fed. R. Crim. P. 11(e); *United States v. Richardson*, 195 F.3d 192, 194-97 (4th Cir.1999)).

First, the defendant claims that testimony by cooperating witnesses is inherently unreliable because those witnesses are seeking sentencing consideration.   The defendant relies heavily on the *Levenite* case, although that case does not further his position.   In *Levenite*, the FBI had a paid cooperator who testified at trial against the defendants and whose payment included a lump sum

---

5       This is not surprising as the Government has not yet produced *Jencks* materials.

bonus of up to $100,000 that was contingent upon his testimony and the outcome of the case. *Levenite*, 277 F.3d at 458.   Although the Fourth Circuit outlined both the risks of such an arrangement and the reasons why it might be necessary to secure the evidence, *id.* at 461-62, the Court affirmed the convictions based on this testimony, noting that the Government had taken various steps that demonstrated the reliability of the payment arrangement, such as disclosure of the arrangement, allowing for cross-examination, and making the agreement contingent on truthful testimony.  *Id.* at 463.

The situation here is, of course, very different from that faced in *Levenite*.  Here, the cooperating witnesses have sought sentencing benefits, which "are appropriate tools for use in the criminal justice system," and which will involve the court in determining the appropriate sentence. *See Levenite*, 277 F.3d at 461–62.

The defendant demands a pre-trial hearing to determine the reliability of the witnesses.  He provides, of course, no basis for such a hearing.  Moreover, the determination of the reliability of such lay witness testimony – subject to cross-examination, of course – is precisely the role of a duly selected jury.  There is simply no reason to try the case twice – once at a pretrial hearing and yet again in front of a jury.  The two state cases that the defendant identifies as the basis for such a hearing are inapplicable.  In *D'Agostino v. State*, the court held that testimony at the penalty phase of trial by a former cellmate of the defendant that the defendant had admitted to several unrelated murders was inappropriate where there was insufficient detail to either confirm or rebut the accusations.  107 Nev. 1001, 1003, 823 P.2d 283, 284 (1991) ("Absent any details as to time, place and victim, an accused who must face this kind of incriminating testimony is seriously and unfairly prejudiced when the jury comes together to deliberate as to whether he should live or die.").  In *Dodd v. State*, the court held that the trial court had erred in precluding the defendant

from cross-examining his former cellmate with letters the cellmate wrote that reflected the changing of his testimony and his motivation for changing his testimony.  993 P.2d 778, 782 (OK 2000).

Here, the defendant has been charged with particular crimes, including numerous overt acts.  In addition, the Government will provide all the materials required related to the testimony of cooperating defendants, and this Court will determine what is appropriate grounds for cross-examination.  Thus, this is nowhere near the vague allegation at sentencing that the defendant admitted to killing someone, somewhere, as was the case in *D'Agostino* or a defendant who was not permitted to use *Jencks* materials to cross-examine a former cell mate, as was the case in *Dodd*.

As with several of Guerra-Castillo's other motions, he does not identify any particular cooperator or testimony that he seeks to exclude.  This is not surprising because, at this point, the defendant has not received yet received the *Jencks* disclosures and any information about the Government's arrangements with cooperating witnesses.  Although it should not be necessary, once these materials are produced the Government will not object to the defendant re-raising this motion as to specific cooperating witnesses.[6]  Thus, the defendant's motion should be denied without prejudice to re-raise the issue should he identify related issues involving specific cooperating witnesses as a part of the *Jencks* disclosures.

---

6       *See also United States v. Torrez*, No. 1:11-CR-115, 2013 WL 204727, at *12 (E.D. Va. Jan. 17, 2013), aff'd, 869 F.3d 291 (4th Cir. 2017) ("[T]he Court believes that disclosures by the government will satisfy Mr. Torrez's requests for details of the relationship between informant witnesses and the government, Mr. Torrez's motion is denied without prejudice. If, after receiving the next round of discovery from the government, Mr. Torrez still believes reliability hearings are necessary, then he may renew his motion at that time, and the Court will consider either having reliability hearings or allowing time for voir dire of witnesses prior to their testimony.")

7.      Motion to Preserve Right to File Pretrial Motions (ECF 601)

Guerra-Castillo has also filed a Motion to Preserve the Right to File Pretrial Motions (ECF

601).  The Government does not object to the timing of any motion that has not been possible until

the disclosure of information – such as *Jencks* material – that has not yet been provided to defense

counsel.

F.      **Portillo-Rodriguez Motions**

Portillo-Rodriguez has also filed a number of motions, each of which is addressed below.

1.      Motion to Suppress Tangible and Derivative Evidence (ECF 592)

a)      10 Bricin Court, Apt 4

The Government does not intend to introduce any evidence in its case-in-chief against

Portillo-Rodriguez seized from 14 Bricin Court, Apartment 4.  ECF 592.  No search was conducted

at that location.  As a result, this motion is moot.

b)      T Mobile cellphone – 443-599-6921

The defendant seeks to suppress evidence related to T-Mobile cellphone number 443-599-

6921.  ECF 592.

On September 28, 2017, the Circuit Court for Anne Arundel County issued a search

warrant authorizing law enforcement to obtain data from T-Mobile about two phone numbers.

That warrant was based on an application and affidavit submitted by Anne Arundel County

detective Adrian Lewis.  The warrant and related documents are attached as Exhibit 14.[7]

First, the warrant was amply supported by probable cause.  *See* Gov't Ex. 14.  The

supporting affidavit included a thorough recitation of the facts supporting probable cause.  *Id.* at

1-4.  For example, the affidavit set forth information provided by a source of information about a

---

[7]      This location information was obtained prior to the decision in *United States v. Carpenter*, 138 S. Ct. 2206 (2018).  So, although law enforcement did obtain a search warrant, doing so for historical cell site location information had not yet been mandated.

murder. *Id.* at 2. It also explained that the source had taken investigators to the location where the victim had been buried and, as a result, investigators were able to recover the body and positively identify the victim. *Id.* It explained that "Tricky," who was identified as Ervin Arrue Figuero, and others had committed the murder. Ex. 14 at 3. It detailed that, a few weeks before the murder, Arrue Figuero and Milton Portillo Rodriguez were stopped together by Maryland Natural Resource police and provided their phone numbers as the target numbers. *Id.* at 3. It also explained the relevance of cellular phone information (particularly the location information and usage data) to the investigation and the details of how it would be used. *Id.* Thus, contrary to the defendant's assertions, the affidavit established not only how the phone number was connected to the investigation, but also how it related to Portillo Rodriguez – that the defendant himself used it.

The Court therefore correctly found that there was probable cause that the evidence sought to be obtained by the warrant—namely, evidence of the location and usage of cellular telephone number 410-831-7191—would lead to the recovery of evidence related to the attacks on the victims.

c)      <u>Sprint cellphone – 919-327-7147</u>

The defendant also seeks to suppress information obtained by law enforcement from Sprint related to cell phone number 919-327-7147. ECF 592.

On October 5, 2017, the Circuit Court for Anne Arundel County issued an order that Sprint provide several pieces of information about 919-327-7147, including subscriber information, historical location data for the prior 30 days, and prospective location data for the next 30 days. Oct. 5, 2017 Order at 1-2, attached as Exhibit 15.

The application for a pen register and real time location information for cellular telephone number 919-327-7147 was facially valid, supported by probable cause, and established that evidence of the attempted murders would be found in the sought after information. *See* Ex. 16.

First, AAPD Detective Lewis explained that information about the murder of a victim had been provided by a Source who had led investigators to the body. Ex. 16 at 2. The Source had explained the details of the murder and that Milton Portillo-Rodriguez had participated. Ex. 16 at 3. Det. Lewis then explained that another Source came forward shortly after and provided similar information about the murder and confirmed that Portillo-Rodriguez had participated. Ex. 16 at 3. Due to this information, Det. Lewis explained that an arrest warrant had been issued for Portillo-Rodriguez. *Id.*

Det. Lewis then explained that investigators had – through investigative leads – identified 919-327-7147 as a possible cell phone for Portillo-Rodriguez. *Id.* Because Portillo-Rodriguez might have used the phone at the time of the murder and might still be using it, and because suspects in the case had been using cellular phones to communicate before and after the crime, Det. Lewis explained that the information about the phone and its location would be relevant to the murder investigation. *Id.* at 4.

Accordingly, the Court lawfully authorized the installation of the pen register and the disclosure of real time location information. As a result, the defendant's motion to suppress this evidence is unavailing.

Moreover, as discussed further below, even were there some deficiency in the probable cause outlined in the application, law enforcement acted reasonably in relying on the Court Order.

d)      301-383-6412

The defendant also seeks to suppress information obtained by law enforcement from Sprint related to cell phone number 301-383-6412. ECF 592.

Specifically, on September 27, 2017, the Anne Arundel County Circuit Court issued a warrant ordering T-Mobile to provide information relating to 301-383-6412, including subscriber information, call detail records, location data, and text messages or other retained content. Ex. 17

at 4-5. On the same date, the Court also issued an order authorizing the installation of a PEN register and the disclosure of real time location data for 301-383-6412, Ex. 19, based on the application of Det. Lewis. Ex. 18. The applications detail essentially the same set of facts. Compare Ex. 17 at 2-3, with Ex. 18 at 2-4.

The application for a search warrant was facially valid, supported by probable cause, and established that evidence of the attempted murders would be found in the sought after information. *See id.* at 1-3. In that application, Det. Lewis outlined information provided by a Source about a murder of a victim in Crownsville, Maryland and that the Source had led law enforcement to that body. Ex. 17 at 2. Det. Lewis explained that the plan to murder the victim had been put together about a week before the murder. *Id.* at 2. He explained that "Little Gangster" participated in planning the murder and the murder itself. *Id.* at 3. He also explained that the Source and provided several numbers for Little Gangster, including 301-732-1623. *Id.* at 3. He also explained why that information requested would be important to the murder investigation. *Id.* at 3.

Accordingly, the Anne Arundel County Circuit Court lawfully issued the search warrant at issue. As a result, the defendant's motion to suppress this evidence is unavailing.

Moreover, as discussed further below, even were there some deficiency in the probable cause outlined in the application, law enforcement acted reasonably in relying on the lawfully issued warrant.

e)        Other Phone Numbers

Portillo-Rodriguez also moves to suppress evidence resulting from searches on several other numbers: 443-822-2495, 443-682-5551, and 443-882-8734. ECF 592. The Government does not anticipate introducing the results of any searches of those numbers in its case-in-chief against Portillo-Rodriguez. As a result, this portion of his motion should be denied as moot.

2.      Motion to Suppress Statements (ECF 593)

a)      Applicable Law.

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.   In *Miranda v. Arizona*, the Supreme Court held that members of law enforcement must inform individuals who are in custody of their Fifth Amendment rights prior to interrogation.  384 U.S. 436, 444 (1966).  Specifically, an individual interrogated while in police custody "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) (quoting *Miranda*, 384 U.S. at 444).  *Miranda* warnings may be given orally or in writing.  *See, e.g.*, *United States v. Abdi Wali Dire*, 680 F.3d 446, 474 (4th Cir. 2012) (upholding oral warnings and stating that "no precise formulation of the warnings or talismanic incantation is required to satisfy Miranda's strictures" (citation and alterations omitted)); *United States v. Frankson*, 83 F.3d 79, 81 (4th Cir. 1996) (same).

In addition to complying with *Miranda*, an individual's statements also must be provided voluntarily.  The applicable test for evaluating the voluntariness of a statement or confession is whether, given the totality of the circumstances, the will of the speaker was "overborne and his capacity for self-determination critically impaired."  *United States v. Gray*, 137 F.3d 765, 771 (4th Cir. 1998) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)); *see also Mincey v. Arizona*, 437 U.S. 385, 399 (1978); *Haynes v. Washington*, 373 U.S. 503, 513 (1963).  In making this determination, "coercive police activity is a necessary predicate" to any finding that a confession was not "voluntary" within the meaning of the Due Process Clause of the Constitution. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  In applying these general principles to various factual scenarios, the Fourth Circuit has considered, among other things, factors such as: (1)

whether law enforcement officers properly advised the suspect of his right not to make any statements and of his right to have an attorney present; (2) whether the officers inappropriately told the suspect that he was legally obligated to speak with them; (3) whether the officers physically or verbally threatened the suspect; (4) whether the suspect appeared to be cooperative; (5) whether the suspect was misled by the officers into believing that his statements could not be used against him; and (6) whether the officers engaged in any violent behavior during their questioning. *See generally United States v. Braxton*, 112 F.3d 777, 781-85 (4th Cir. 1997); *Gray*, 137 F.3d at 771.

However, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . .Volunteered statements of any kind are not barred by the Fifth Amendment." *Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980); *see also Michigan v. Harvey*, 494 U.S. 344, 353 (1990) ("Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will."). The Fourth Circuit has explained that "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) (internal quotation marks omitted); *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993) ("[S]pontaneous statements [that are] not the product of interrogation [are] not barred by the Fifth Amendment."); *United States v. Jackson*, 863 F.2d 1168, 1172 (4th Cir. 1989) (holding that officer's statement in response to conversation initiated by the defendant should not be construed as attempt to solicit information); *see also United States v. Williams*, 16 Fed. Appx. 90, 92 (4th Cir. 2001) ("it is . . . well settled that spontaneous or volunteered statements that are not the product of interrogation or its functional equivalent are not barred by *Miranda*, even if the

defendant is in custody when the statements are made" (citations omitted)).   A defendant's statement falling within this exception does not constitute an interrogation and is admissible at trial.  The government bears the burden of proving voluntariness or spontaneity by a preponderance of the evidence.  *See, e.g.*, *Braxton*, 112 F.3d at 781.

> b) Portillo-Rodriguez's Statements to Law Enforcement Were Voluntarily Made Following the Proper Administration of *Miranda* Warnings.

Defendant Portillo-Rodriguez contends that he was not properly read his *Miranda* rights before providing statements to officers, and that his statements were involuntary, and therefore, his statements should be suppressed.  ECF 593.  The government denies that any statement made by Portillo-Rodriguez was improperly obtained and consents to a hearing to determine admissibility.

At the hearing, the government will establish that Portillo-Rodriguez's statements to law enforcement are admissible.  Following his arrest on an Anne Arundel County arrest warrant, on November 5, 2017, Portillo-Rodriguez was initially interviewed by Detective Kelly Harding from Anne Arundel County, Ex. 20 (video and audio recording), then by Detectives Eric Glass and Beverly Then from Montgomery County, Ex. 21 (video and audio recording); Ex. 22; Ex. 23.

At the beginning of each interview, the detective reviewed *Miranda* rights through a Spanish-speaking officer.  Ex. 20 at 0:00-3:30 (Harding); Ex. 21 at 5:00-7:15 (Glass).[8]  Before Detective Then joined the interview, officers let Portillo-Rodriguez speak briefly with his mother on the phone.  Ex. 21 at 57:45-59:45.

---

[8]     Det. Glass did ask some background questions before starting the interview.  *See United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) ("there exists an exception to Miranda's coverage for routine booking questions securing 'biographical data necessary to complete booking or pretrial services'" and holding that routine background questions during booking regarding nationality and address did not violate defendant's *Miranda* rights).

Rather than remaining silent, Portillo-Rodriguez then willingly proceeded to answer questions.  *United States v. Cardwell*, 433 F.3d 378, 389-90 (4th Cir. 2005) ("Waiver need not be express, but may be implied from the defendant's actions and words."); *see also United States v. Hayes*, No. CR RDB-14-0577, 2015 WL 9302930, at *1 (D. Md. Dec. 22, 2015) (waiver can be inferred from the facts and circumstances).   During the course of the interviews, Portillo-Rodriguez, who was emotional throughout, admitted to connections to certain other co-conspirators but denied involvement in the murders in Anne Arundel County and Montgomery County.  Throughout his interview, the Defendant was cooperative and voluntarily responded to questions from detectives.  Furthermore, officers neither physically or verbally threatened Portillo-Rodriguez, nor did they engage in any violent behavior during questioning.  The statements therefore were voluntary and should not be suppressed.

### G.       Good Faith

Even assuming that one or all of the above-described authorizations were invalid, which they were not, the exclusionary rule should not apply because the officers acted in good faith reliance on the issuance of the warrants.  *See United States v. Leon*, 468 U.S. 987 (1984).  Under the Leon good faith exception, "a court should not suppress the fruits of a search conducted under the authority of a warrant, even a subsequently invalidated warrant, unless a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization."  *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002).  Officers are presumed to have acted in good faith except in certain narrowly defined circumstances: "(1) if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate wholly abandoned his judicial role…; (3) if the affidavit supporting the warrant is so

lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) if under the circumstances of the case the warrant is so facially deficient…that the executing officers cannot reasonably presume it to be valid." *United States v. DeQuasie*, 373 F.3d 509, 519–20 (4th Cir. 2004).

In conducting a good faith analysis under *Leon*, courts can consider uncontroverted facts known to the affiant, but inadvertently not included in the affidavit. *See United States v. McKenzie-Gude*, 671 F.3d 452,461 (4th Cir. 2011). In *McKenzie-Gude*, the search warrant affidavit did not sufficiently describe the nexus between the defendant and the residence searched. The affiant, however, possessed uncontroverted knowledge at the time, that if included in the affidavit, would have provided the required nexus. *Id.* at 458-459. In holding the good faith applicable, the Court stated "we believe that *Leon* presents no barrier to holding that the experienced officers in this case, who swore out the affidavit and executed the search, acted with the requisite objective reasonableness when relying on uncontroverted facts known to them but inadvertently not presented to the magistrate." *Id.* at 460.

Here, each of the affidavits at issue contained ample evidence of probable cause. However, even if the Court determined that an affidavit lacked sufficient probable cause, the officers certainly acted in good faith when executing the warrant. None of the four narrowly defined exceptions to the "good faith" exception described in *DeQuasie* applies to any of the search warrants at issue here. Each warrant contained a detailed description of the facts surrounding the investigation and related those facts to the information sought by the warrants. The affidavits are not the type of "bare bones" affidavits that courts have previously held lacked the requisite objectively reasonable information to apply the good faith exception. *See United States v. Doyle*, 650 F.3d 460, 471-473 (4th Cir. 2011); *United States v. Wilhelm*, 80 F.3d 116, 121-22 (4th Cir.

1996) ("the Leon good-faith exception does not apply in the case of a bare-bones affidavit").  Here, there is no assertion in the defendants' motions that the detectives knew that the information included in the affidavits lacked probable cause thereby negating the objectively reasonable standard.  Further, a judge authorized each warrant.  Therefore, even if the Court determines that one or more of the warrants or applications lacked sufficient probable cause, the Court should not preclude the admission of the evidence seized from the execution of the search warrants or applications pursuant to the *Leon* "good faith" exception.

Ultimately, as the Court can see from all of the judicially authorized warrants discussed above, investigators in this case carefully and deliberately sought court authorization for nearly every investigative measure they employed.  Law enforcement brought numerous applications to the various courts each of which outlined their investigative measures and their bases for probable cause.  Thus, even assuming the myriad search warrants were somehow deficient (which they were not), the investigators acted in good faith reliance on the court's orders and suppression is not warranted.

### H.      Motions for Leave to File Additional Motions

The government takes no position as to the motions by defendants for leave to file additional motions after the deadline imposed by the Court in this case.  However, to the extent the defendants are allowed to file additional motions, the government respectfully requests at least two weeks to respond.

### IV.      NOTE REGARDING HEARING

This case was original scheduled for a week-long motions hearing, starting on Monday, December 9, 2019.  In light of the motions that remain pending, the Government anticipates that most of the pending motions will not require witness testimony.  As a result, the Government anticipates calling no more than 4-5 witnesses to address relatively limited issues.  As a result, the

Government believes that the motions hearing should not take more than two days, if it even needs to go into a second day.

## V.     CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the Defendants' pre-trial motions.

Respectfully submitted,

Robert K. Hur
United States Attorney


By:     _____/s/_____
Kenneth S. Clark
Matthew DellaBetta
Catherine K. Dick
Assistant United States Attorneys
36 South Charles St., 4th Floor
Baltimore, Maryland 21201
Tel.: (410) 209-4800

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a copy of the foregoing was delivered on November 19, 2019, to the CM-ECF system of the United States District Court for the District of Maryland for electronic delivery to all counsel of record.


_____/s/_____
Kenneth S. Clark